## ALLISON *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 693. Submitted November 20, 1895. — Decided December 16, 1895.

When a person indicted for the commission of murder, offers himself at the trial as a witness on his own behalf under the provisions of the act of March 16, 1878, c. 37, 20 Stat. 30, the policy of that enactment should not be defeated by hostile intimations of the trial judge. *Hicks* v. *United States,* 150 U. S. 442, affirmed.

The defendant in this case having offered himself as a witness in his own behalf, and having testified to circumstances which tended to show that the killing was done in self-defence, the court charged the jury: "You must have something more tangible, more real, more certain, than that which is a simple declaration of the party who slays, made in your presence by him as a witness, when he is confronted with a charge of murder. All men would say that." *Held,* that this was reversible error.

Other statements made by the court to the jury are held to seriously trench on that untrammelled determination of the facts by a jury to which parties accused of the commission of crime are entitled.

What is or what is not an overt demonstration of violence sufficient to justify a resistance which ends in the death of the party making the demonstration varies with the circumstances; and it is for the jury, and not for the judge, passing upon the weight and effect of the evidence, to determine whether the circumstances justified instant action, because of reasonable apprehension of danger.

Where the charge of the trial judge takes the form of animated argument, the liability is great that the propositions of law may become interrupted by digression, and be so intermingled with inferences springing from forensic ardor, that the jury will be left without proper instructions, their province of dealing with the facts invaded, and errors intervene.

JOHN ALLISON, some twenty years old, was indicted for the murder of his father, William Allison, on the fifth day of January, 1895, at the Cherokee Nation in the Indian country, in the Western District of Arkansas, found guilty by a jury, under the instructions of the court, and sentenced to be hanged, whereupon he sued out this writ of error.

The evidence tended to show that the Allisons resided up to the year 1893 in the State of Washington; that the parents had been divorced; that the father had repeatedly threatened the lives of the members of his family, and for an assault upon one of his sons and his son-in-law, by shooting at them with a pistol, had been sent to the penitentiary for a year; and that thereupon the family left the State of Washington and came to the Indian country. In about a year the father appeared, first at Hot Springs, Arkansas, where one daughter had located, and then in the neighborhood of the other members of the family in the Indian country; and at once began threatening the lives of the entire family, and particularly that of his son John. A great variety of vindictive threats by the deceased in Washington, at Hot Springs, and in the Indian country was testified to.

Evidence was also adduced that on one occasion he came to the house where the mother and her children were living and demanded to see the children, who (except John and one whom he had seen) were not at home, and he then wished to see their mother, who objected to meeting him; that he persisted, whereupon his son John, who had a gun in his hand, told him he must leave, and the father dared John to come out and he would fight him outside, but John answered that he did not want any trouble with him — only wanted him to stay away from there, and the deceased replied: "God damn you, I will go off and get a gun and kill the last damned one of you;" that he subsequently told his son-in-law to tell John Allison

" that he would blow his God damned brains out the first time he seen him; told him to tell him he would kill his mother and the entire family ; " that the day after this occurrence John Allison and his mother made an affidavit to get a peace warrant for William Allison, and on that occasion John told the prosecuting attorney that the old man threatened his life, and he thought he was in danger, and asked him if he killed the old man what would be done with him, and he replied that " if the old man came to his house and raised a racket and tried to carry out his threats that he told me he had made on him, I told him he would be justified in doing it," but that he must not go " hunting the old man up and trying to kill him," and that John said, " I will not bother him ; if he will let me alone, I will let him alone ; " and that this was five or six days before the killing. The evidence further tended to show that the deceased had been in the habit of carrying a pistol; that he stated that he had one; that on New Year's day he threatened one of the witnesses with that weapon, and another witness testified to catching a glimpse of it once when he put his hand around to his hip pocket; but that he had no pistol on him when he was killed. The deceased was staying at the house of one Farris, and a witness testified in rebuttal to conversing with John when he was " warming " on one occasion at the barn — presumably Farris' barn.— and asking him why he did not go up to the house, and he said he did not want to go up there; that he was afraid he and his father would have some trouble; that he was afraid his father would hurt him; and that he was going to kill him just as quick as he caught him away from the house.

As to the circumstances immediately surrounding the homicide, the defendant testified that he and a man by the name of Rucker had killed a deer near Rucker's the day before, and that he had promised Rucker to come back the next day to hunt for others, and was riding by Farris' place, which was on the road to Rucker's, with his gun in his hand, on that errand, on the morning of January 5, when he saw a person whom he took to be his brother Jasper up at Farris' house;

that this person turned out to be Farris with his brother's coat on; but he stopped at the stable thinking that his brother would come down that way, as he had learned from his sister that his brother was to be at the place at that time for the purpose of removing some household goods; that he did not go up to the house because he did not want to meet his father; that shortly after he arrived at the barn his father came through the gate, and he stepped to one side to let him go into the barn if he wished to, but deceased did not go towards the door, came straight towards him, and when he got a few feet from him said: " You have got it, have you? " and threw his hand back as if he was going to get a pistol; " made a demonstration that way," and that this demonstration and the threats he had made led defendant to believe that he was going to draw a pistol, and he fired; that he fired three shots, but none after the deceased fell. Defendant was corroborated by Rucker and others in many particulars, but contradicted by the government's witnesses in respect of firing after his father was down, they testifying that he fell at the first shot.

*Mr. William M. Cravens* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It was claimed on behalf of defendant that the homicide was excusable because committed in self-defence, in that, his life having been repeatedly threatened by deceased, when he saw him on this occasion moving his hand as if to take a pistol from his hip pocket, he believed, and, as a prudent man, might reasonably have believed, at that time and under those circumstances, that he was in imminent and deadly peril which could only be averted by the course he pursued; or that, at the most, he could only be found guilty of manslaughter for acting under an unreasonable access of fear, but without malice.

The threats were conceded; and there was evidence that

the deceased was in the habit of carrying a pistol; that he had recently carried one in his hip pocket; that he had sent word to defendant that he should kill him on sight; that defendant had started on a hunting expedition that morning; and that his stopping at Farris' place was accidental; but the facts that he at first stepped away from his father, and that the latter advanced on him and made the threatening demonstration as if to draw a pistol, which the defendant knew he was accustomed to have upon him, apparently depended on defendant's testimony alone. The question for the jury to determine, from all the facts and circumstances adduced in evidence, was the reasonableness of the belief, or fear, of the existence of such peril of death or great bodily harm as would excuse the killing. And it was for the jury to test the credibility of the defendant as a witness, giving his testimony such weight under all the circumstances as they thought it entitled to, as in the instance of other witnesses, uninfluenced by instructions which might operate to strip him of the competency accorded by the law.

We repeat what was said by Mr. Justice Shiras, speaking for the court, in *Hicks* v. *United States,* 150 U. S. 442, 452: "It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices, and, perhaps, a judge cannot be considered as going out of his province in giving similar caution as to the testimony of the accused person. Still, it must be remembered, that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury properly enough give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is, that 'the person charged shall at his own request, and not otherwise, be a competent witness.' The policy of this enactment should not be defeated by hostile intimations of the trial judge, whose duty it is to give reasonable effect and force to the law."

Similar views have been expressed in many cases in the state courts.

In *Commonwealth* v. *Wright*, 107 Mass. 403, it was held that there was no presumption either way as to the truthfulness of a defendant's testimony in a criminal case, and that his testimony is to be considered and weighed by the jury, taking all the circumstances of the case and all the other evidence into consideration, and giving such weight to the testimony as in their judgment it ought to have.

"It cannot," observed Scholfield, J., in *Chambers* v. *The People*, 105 Illinois, 409, "be true that the evidence given by the defendant charged with crime is not to be treated the same as the evidence of other witnesses. It could not even be true, as a universal proposition, that, as matter of law, it is not to have the same effect as the evidence of other witnesses. Many times it certainly cannot have that effect, but there are times when it can and should, — and of this the jury are made the judges."

And see *Greer* v. *State*, 53 Indiana, 420; *Veatch* v. *State*, 56 Indiana, 584; *Buckley* v. *State*, 62 Mississippi, 705; *State* v. *Johnson*, 16 Nevada, 36.

Among the errors assigned in the present case was one to so much of the charge as is given below in italics, in respect of which a sufficient exception was preserved. The trial judge said:

"You have heard in argument here, incidentally dropped, no doubt, because these things have been repeated here so often in this court that every child knows what the law of self-defence is, that if a man thinks he has a right to slay he can slay. That is a great misapprehension of what this proposition of the law is and what it means. If that was the case how many men, when they were arraigned for the killing of a human being, would not assert that they thought they had a right to kill; they might be mistaken, but they thought so. They perhaps had a misunderstanding of the law, but then they thought they had the right to kill. What a perversion of this protection agency called the law of the land this would be! No, that is not the law. It must be shown

by the evidence that the party who was slain was at the time doing something that would satisfy a reasonable man, situated as was the defendant, that the deceased, William Allison, then and there was about to do that which would destroy the life of the defendant, and that he could not prevent it except by doing as he did do. *The question as to whether that is the state of case or not is a question that is to be finally passed upon by the juries of the country, and by you in this case, and you must have something more tangible, more real, more certain, than that which is a simple declaration of the party who slays, made in your presence by him as a witness when he is confronted with a charge of murder. All men would say that. No man created would say otherwise when confronted by such circumstances, and the juries, as a matter of fact, would have nothing to do but to record the finding which was willed or established by the declaration of the party who did the killing.*"

In this there was error. While the trial judge may not have intended to be understood that the defendant could not prove his defence by his own testimony, and had it in his mind simply to warn the jury that they should not rely on the defendant's opinion that his conduct was justifiable, but on the facts, or what reasonably appeared to him to be such, we think these remarks had a much wider scope, and must have been so understood by the jury. The "state of case" put to the jury was whether William Allison was at the time doing something that would satisfy a reasonable man, situated as defendant was, that he was about to do what would destroy defendant's life, and which defendant could not prevent except by doing as he did; and the question as to the existence of that state of case was required by the instruction to be passed on by the jury on something more than defendant's declaration, which, it was stated, would certainly be made by any man created when confronted with a charge of murder.

Defendant had testified to the facts upon which he based his belief that he was in peril, and it was for the jury to say from the evidence whether the facts as he stated them actually or apparently existed, and whether the homicide could,

therefore, be excused either wholly or in part. And if the jury regarded the remarks of the court as applicable generally to defendant's testimony, then defendant was practically deprived of its benefit, and the statute enabling him to testify was rendered unavailing. In our opinion the liability of the jury to thus understand these observations was so great that their utterance constitutes reversible error.

Nor was this error obviated by what, some time after — the intervening portion of the charge occupies six closely printed pages — was said by the trial judge, as follows : " The defendant has gone upon the stand, and he has made his statement. See if it is in harmony with the statements of witnesses you find to be reliable. If they are not, they stand before you as contradicted. If they are, they stand before you as strengthened as you may attach credit to the corroborating facts. In passing upon his evidence you are necessarily to .consider his interest in the result of this trial, in the result of this case. He is related to the case more intimately than anybody else, and you are to apply the principle of the law that is laid down everywhere in all civilized countries, commanding you to look at a man's statements in the light of the interest that he has in the case. There is no odor of sanctity thrown around the statements of the defendant as a witness, as is sometimes supposed, because he is charged with crime. You are to view his statements in the light of their consistency, their reasonableness, and their probability, the same as the statements of any other witness, and you are to look at them in the light of the interest he has in the result of the case." If this could be, in any aspect, treated as a modification of the previous assertions of the court, it was too far separated from that connection to permit us to attribute that operation to it, and, moreover, it was in itself erroneous. As a witness, a defendant is no more to be visited with condemnation than he is to be clothed with sanctity, simply because he is under accusation, and there is no presumption of law in favor of or against his truthfulness.

Exception was taken, not with much precision, but, we are disposed to hold, sufficiently to save the point, to the following

instruction, given in discussing the question of malice afore-thought:

"Now, of course, you are to distinguish (and I have to be particular upon this point; I have my reasons for it, and it is not necessary to name to you what they are) between a case where a man prepares simply to defend himself and keeps himself in the right in that defence, and a state of case where he prepares himself recklessly, wantonly, and without just cause to take the life of another. If he prepares himself in the latter way, and he is on the lookout for the man he has thus prepared himself to kill and he kills him upon sight, that is murder, and it would shock humanity or even the most technical and hair splitting court to decide anything else. That can be nothing else but murder. If he is in the right — if he is in the right at the time of the killing — and simply prepared himself to defend his own life, that is preparation not to take the life of another, but preparation to defend himself. That is the distinction, a distinction that is clear and comprehensive."

And also to this in reference to the exercise of the right of self-defence:

"The first proposition is as follows: 'A man, who, in the lawful pursuit of his business' — I will tell you after a while what is meant by that. I will tell you, in short, in this connection it means that the man is doing at the time just exactly what he had a right to do under the law. When so situated — 'is attacked by another under circumstances which denote an intention to take away his life, or to do him some enormous bodily harm, may lawfully kill the assailant, provided he uses all the means in his power, otherwise, to save his own life or to prevent the intended harm — such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power.' Now, that means by its very language that the party was in the right at the time. If he was hunting up his father for the purpose of getting an opportunity to slay him without just cause and in the absence of legal provocation, he was not in the right, and the consequence would be that he would be deprived of the law of self-defence, as you will learn presently, when such a condition as that exists. Now, of

.course, in this connection — and I am this particular again for certain reasons — you are to draw the distinction between a state of case where a man arms himself, where there is ill will, or grudge, or spite, or animosity, existing, and he hunts up his adversary and slays him, and the state of case where he simply arms himself for self-defence. He has a right to do the latter as long as he is in the right, but he has no right to do the former, and if he does the former and slays because of that condition he is guilty of murder."

We are of opinion that defendant's objections to these portions of the charge are well founded. The hypothesis upon which the defence rested on the trial was that John Allison had a gun with him on the morning of the tragedy, in order to hunt deer; and that his stopping at Farris' place, which was on his way to Rucker's, was accidental. His testimony to this effect was corroborated, and was not contradicted.

Justice and the law demanded that so far as reference was made to the evidence, that which was favorable to the accused should not be excluded. His guilt or innocence turned on a narrow hinge, and great caution should have been used not to complicate and confuse the issue. But the charge above quoted ignored the evidence tending to show that defendant had not armed himself at all, but had a gun with him for purposes of sport, and that his halt at Farris' had no connection whatever with the deceased; and invited the jury to contemplate the spectacle of a son hunting up his father with the deliberately preconceived intention of murdering him, unrelieved by allusion to defensive matter, which threw a different light on the transaction.

If defendant were " in the right at the time of the killing," the inquiry as to how he came to be armed was immaterial, or, at least, embraced by that expression. If there were evidence, and as to this the record permits no doubt, tending to establish that defendant carried his gun that morning for no purpose of offence or defence, then this disquisition of the court was calculated to darken the light cast on the homicide by the attendant circumstances as defendant claimed them to be; and of this he had just cause to complain, even though

there were competent evidence indicating that he harbored designs against his father's life, as frequently intimated by the court — intimations which we fear seriously trenched on that untrammelled determination of the facts by a jury to which parties accused are entitled.

As will have been seen, the theory of the defence was that defendant was in terror of his life by reason of the threats of deceased to take it, and was, therefore, led to interpret the alleged menacing action of deceased as demonstrating an intention then and there to carry those threats into execution. The bearing of the previous threats then was very important, and in relation to them the trial judge admonished the jury as follows:

"Now, then, these mitigating facts which reduce the killing so as to make it manslaughter cannot be previous acts of violence exerted at some other time, and so far in the past as that there was time for the blood to cool, or the party to think or to deliberate — it cannot be an act of that kind that can be taken into account to mitigate the crime. Nor can they exist in the shape of previous threats, made at some other time than the killing, or, if you please, if the proof had shown that they were made at the time of the killing, because threats of violence, mere threats of that character, cannot be used to justify nor to mitigate a killing, unless they are coupled with some other condition which I will give you in connection with the law given you showing the figure that threats cut in a case. . . . If threats were made previous to the time of the killing, and they were not coupled with the condition that they may be used to illustrate, as I will give it to you presently, and the party kills because of those threats, that is evidence of spite, that is evidence of grudge, that is evidence showing that he kills because of ill will and special animosity existing upon his part against the party who is slain."

After much intervening discussion on other matters, the subject was returned to thus:

"You want to know, of course, what figure threats cut. Evidence has been offered here of threats made by the deceased. You want to know what office they perform in the

case, how you are to view them, whether you are to say that the law authorizes you to say that if a man has been threatened at some time previous to the killing and that he kills because of these threats, or he kills when no overt demonstration of violence, really or apparently, is being made by the party slain at the time, whether or not those threats can be taken into consideration by you to excuse that killing or to mitigate it. . . . Now, you see, they do not cut any office at all in favor of a defendant unless at the time, in this case, his father was doing some act, making some actual attempt, to execute the threat, as shown by some act or demonstration at the time of the killing, taken in connection with the threat, that would induce a reasonable belief upon the part of the slayer that it was necessary to deprive his father of life in order to save his own or prevent some felony upon his person. That is the law, stated plainly, as to the office of communicated threats. . . . If he (the deceased) was doing some act or making some demonstration that really or apparently was of a character that indicated a design to take life, then the defendant could couple previous threats made with the act or demonstration. Now, the act or demonstration must have gone sufficiently far to show a reasonable purpose or to induce a reasonable belief, when coupled with threats, under the circumstances, that that was William Allison's purpose at the time. It must have gone to that extent. It must have gone sufficiently far, the overt act done by him, as to induce a reasonable belief, when coupled with threats, that that was his purpose. . . . Now, you see that no matter how many threats William Allison may have made against his family, and no matter to what extent this family broil had gone, this defendant because of threats of that character could not hunt him up and shoot him down because of those threats. If that was the state of case the threats cannot be considered in his favor, but they may be considered to show that he killed him because of malice, because of malice aforethought existing, because of a spirit of spite, or ill will, or grudge, that he was seeking to satisfy by that sort of attack."

Defendant excepted to so much of these instructions as ruled

that threats to take his life might be treated as constituting evidence of spite, or ill will, or grudge on his part.

In *Wiggins* v. *People*, 93 U. S. 465, it was held that, on a trial for a homicide committed in an encounter, where the question as to which of the parties commenced the attack is in doubt, it is competent to prove threats of violence against defendant made by deceased, though not brought to defendant's knowledge, for the evidence, though not relevant to show the *quo animo* of the defendant, would be relevant, under such circumstances, to show that at the time of the meeting deceased was seeking defendant's life. Wharton Crim. Ev. § 757; *Stokes* v. *People*, 53 N. Y. 164; *Campbell* v. *People*, 16 Illinois, 17; *People* v. *Scoggins*, 37 California, 676; *Roberts* v. *State*, 68 Alabama, 156. It is from the dissenting opinion in Wiggins' case that the trial judge indulged in quotation in connection with the undisputed proposition that a person's life is not to be taken simply because he has made threats.

Here the threats were recent and were communicated, and were admissible in evidence as relevant to the question whether defendant had reasonable cause to apprehend an attack, fatal to life or fraught with great bodily injury, and hence was justified in acting on a hostile demonstration and one of much less pronounced character than if such threats had not preceded it. They were relevant because indicating cause for apprehension of danger and reason for promptness to repel attack, but they could not have been admitted on a record such as this, if offered by the prosecution as tending to show spite, ill will, or grudge on the part of the person threatened; nor could they, being admitted on defendant's behalf, if coupled with an actual or apparent hostile demonstration, be turned against him in the absence of evidence justifying such a construction. The logical inference was that these threats excited apprehension, and another and inconsistent inference could not be arbitrarily substituted. If defendant; to use the graphic language of the court, hunted his father up and shot him down merely because he had made the threats, speculation as to his mental processes was uncalled for. If defendant committed the homicide because of the threats, in the sense

of acting upon emotions aroused by them, then some basis must be laid by the evidence other than the threats themselves before a particular emotion different from those they would ordinarily inspire under the circumstances, could be imputed as a motive for the fatal shot.

What is or is not an overt demonstration of violence varies with the circumstances. Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger; under other circumstances this would not be so. And it is for the jury, and not for the judge, passing upon the weight and effect of the evidence, to determine how this may be. In this case it was essential to the defence that the jury should be clearly and distinctly advised as to the bearing of the threats and the appearance of danger, at the moment, from defendant's standpoint, and particularly so as it did not appear that the deceased then had a pistol upon him, though there was evidence that it was his habit to carry one, and that he had had one immediately before.

We think that the language of the court in the particulars named is open to the criticism made in reference to like instructions under consideration in *Thompson* v. *United States*, 155 U. S. 271, 281, where we remarked: " While it is no doubt true that previous threats will not, in all circumstances, justify or, perhaps, even extenuate the act of the party threatened in killing the person who uttered the threats, yet it by no means follows that such threats, signifying ill will and hostility on the part of the deceased, can be used by the jury as indicating a similar state of feeling on the part of the defendant. Such an instruction was not only misleading in itself, but it was erroneous in the present case, for the further reason that it omitted all reference to the conduct of the deceased at the time of the killing, which went to show an intention then and there to carry out the previous threats."

Other exceptions to parts of the charge were taken, but, while not to be understood as holding that there was no error in respect thereof, we do not feel called upon to prolong this opinion by their consideration, and they may not arise upon another trial.

Where the charge of the trial judge takes the form of animated argument, the liability is great that the propositions of law may become interrupted by digression, and so intermingled with inferences springing from forensic ardor, that the jury are left without proper instructions; their appropriate province of dealing with the facts invaded; and errors intervene which the pursuit of a different course would have avoided.

*Judgment reversed and cause remanded, with a direction to set aside the verdict and grant a new trial.*