**WILLIAMS et al. v. UNITED STATES.\***
No. 8252.

Circuit Court of Appeals, Ninth Circuit.
Dec. 20, 1937.

---

\*Rehearing denied Feb. 18, 1938.

[1] Cameron County Water Imp. Dist. v. De La Vergne Engine Co., 5 Cir., 93 F.2d 373.

Leslie S. Bowden and Clyde C. Shoemaker, both of Los Angeles, Cal. (Samuel W. Blum, of Los Angeles, Cal., of counsel), for appellant Williams.

Ames Peterson, of Los Angeles, Cal., for appellant Black.

Peirson M. Hall, U. S. Atty., and Leo V. Silverstein and Howard V. Calverly, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before GARRECHT, DENMAN, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

The appellants were indicted with five other persons on mail fraud charges. The first ten counts of the indictment alleged the devising of a scheme and artifice to defraud and the use of the United States mails for the purpose of executing such scheme, in violation of section 215 of the Federal Penal Code, 18 U.S.C.A. § 338. The eleventh count charged a conspiracy to do the acts set forth in the first ten counts, all in violation of section 37 of the Penal Code, 18 U.S.C.A. § 88.

The appellants interposed demurrers, both of which were overruled. Requests for a bill of particulars were denied, with the exception of two items requested by the appellant Black. Exceptions were noted to the adverse rulings.

Three defendants were placed on trial, namely, the appellants and William J. Munton. The indictment was dismissed as to the defendants David E. Fulwider and Clare Clee. Before the trial commenced, the defendants Henry M. Dermer and Herbert R. Freeland entered pleas of nolo contendere to the first count, and the remaining ten counts entered against them were dismissed.

Before the trial commenced, counsel for Munton and the appellant Black made a statement to the court which he termed "a demurrer to the evidence," as to all defendants and all counts, and counsel for the appellant Williams moved to exclude all evidence on each count of the indictment. The demurrer was overruled and the motion was denied.

At the conclusion of the appellee's case in chief, counsel for the defendants moved for a directed verdict and to dismiss, which motions were denied and exceptions noted, except that counts 2 and 3 of the indictment were dismissed as to all defendants.

At the conclusion of all the evidence, the appellants renewed the motions made at the conclusion of the appellee's case, for instructed verdicts of not guilty. The motions were denied and exceptions noted.

The jury returned a verdict finding the appellants guilty on counts 1 and 4 to 11, inclusive, and finding the defendant Munton not guilty on all counts of the indictment.

The appellants' motions for a new trial were denied, and judgment in accordance with the verdict was pronounced. From that judgment, the present appeal has been taken.

There are 55 assignments of error, but only 15 specifications are urged in the briefs by the appellant Black and 9 by the appellant Williams.

One of the most meritorious assignments and specifications of error is the one which sets forth that the lower court "erred during the trial of the case in indulging in acts of advocacy, in that the trial court, in examining and cross-examining witnesses and the defendants, virtually assumed the role of a prosecuting attorney."

In reviewing this assignment, we are not unmindful that the able District Judge who tried this case has, heretofore, established a reputation for fairness and judicial poise, and in this opinion we do not wish to imply that the trial judge intentionally was unfair. But as the authorities herein referred to point out, the harm done is not diminished where the judge, by reason of unrestrained zeal, or through inadvertence, departs from "that attitude of disinterestedness which is the foundation of a fair and impartial trial."

The appellants estimate that approximately one-third of the transcript of testimony is devoted to the examination of witnesses by the trial court—or about 220 out of 675 pages. The appellee does not deny this, but, on the contrary, concedes that the court's examination of witnesses was "of considerable length." The appellee contends, however, that the lower court's examination had "no earmarks of unfairness

or unfriendly attitude toward the defendants, but only that of enlightenment to everyone concerned."

It would unduly lengthen this opinion to attempt to summarize the court's entire activities with regard to the examination of witnesses. A few examples, however, will suffice.

To place these examples in their proper setting, a brief glance at the issues is necessary. The case deals with the sale of the stock of the Hollywood Dry Distributing Company, a Delaware corporation, organized in 1928, the name of which was changed to Hollywood Dry Corporation. The appellant Black was general manager of the company, and was also president of the Consolidated Investment Corporation, which had offices both in Los Angeles and Fresno, Cal. Later Black became a director and the executive vice president of the Hollywood Dry Corporation.

The appellant Williams was president of the First National Bank of Fresno. He testified that he and the defendant Dermer brought about the incorporation of Hollywood Dry, Inc., in the summer of 1926. That company, which engaged in the manufacturing of ginger ale and other beverages, was the predecessor of the Hollywood Dry Distributing Company and the Hollywood Dry Corporation. Williams was elected director and vice president of Hollywood Dry Distributing Company on November 12, 1928. The company's plant was first located in San Francisco, but in 1928 moved to Los Angeles.

The indictment charges that, as a part of the "scheme and artifice to defraud," the defendants, while dominating and controlling the Hollywood Dry Distributing Company and the Hollywood Dry Corporation, caused those corporations to issue to the defendants and others large amounts of stock without any consideration being received by the companies therefor; that, as part of the same scheme, the defendants caused certain letters to be sent through the mails; that, also as part of the plan, the defendants, on January 15, 1930, paid to the holders of Class A stock of the Hollywood Dry Corporation moneys which the defendants represented were dividends from the earnings of the corporation, when in truth and in fact the corporation was then operating at a loss, the so-called "dividends" being paid from a source other than the profits of the corporation; and that, still as part

of the scheme to defraud, the defendants set up on the books of the Hollywood Dry Corporation two contracts at a valuation of $485,000 and a promissory note for $200,000, including the contracts and note as assets, when the defendants well knew that such contracts and such note had little or no value.

■ By far the greater part of the examination of the defendant Freeland was conducted by the District Judge. Freeland, who had filed a plea of nolo contendere, was a witness for the appellee. The court's examination of Freeland consumes approximately 64 pages of the transcript. Frequently the court completely took away the examination from counsel, despite the fact that the attorneys on both sides seemed to be conducting their respective cases in an able and lawyer-like manner. The following is an example:

"The Court (interrupting): That sounds like it probably calls for a conclusion. Let me see if I can be of some assistance here.

"Mr. Silverstein [Assistant United States Attorney]: I would like to ask further——

"The Court: (Interrupting) What?

"Mr. Silverstein: I was going to ask further along the same line."

But the court ignored the appellee's attorney and proceeded to conduct the redirect examination in its own way, propounding leading and suggestive questions that would not have been permitted to the prosecutor himself.

Similarly, the court took over the cross-examination of Freeland:

"Mr. Silverstein: That is all of the Government's direct examination.

"Mr. Peterson: Does the Court desire me to proceed with the cross-examination?

"The Court: Just a moment.

"May I have Exhibit 172?"

And thereupon the court began questioning the witness, the examination covering 3 pages of the transcript.

■ Approximately 32 pages of the transcript are taken up with the lower court's examination of the defendant Munton, who had been bookkeeper and assistant secretary of the Hollywood Dry Corporation. Although Munton was acquitted, it must be borne in mind that he testified strongly in favor of his codefendants, particularly the appellants, so that any attempt to hamper

or discredit his testimony would be prejudicial to them.

As in the case of other witnesses, the trial judge interrupted Munton while the latter was answering a proper question on cross-examination. The appellee's attorney had asked the witness why a certain item, derived by subtracting the base valuation of certain shares of stock from the excess of assets over liabilities, had been entered into the surplus account:

"Q. * * * If those figures are correct, I will now ask you if that is not the reason that this $104,046.32 was placed in the surplus account other than in the account that you, as the bookkeeper, had placed it in? A. I didn't have it placed in—

"The Court: It just occurs to me to ask the witness this:

"From time to time after you became Secretary of Hollywood Dry Distributing Company, as appears from the minutes early in September, 1928, did you have anything to do with the preparation of stock certificates and the signing of the same?"

The testimony was thus veered off to another subject, and for approximately 13 pages of the transcript the examination was conducted by the District Judge.

We believe, furthermore, that the court indulged in unnecessary sarcasm in the following colloquy with Munton.

"The Court: And did you ever talk to any officer of Hollywood Dry Distributing Company relative to this consolidated balance sheet?

"A. The Witness. I likely did, your Honor. I have no distinct recollection of it at this time.

"Q. Well, you remember that you were the bookkeeper of the Hollywood Dry, Inc.?"

The court's examination of the appellant Williams consumed 21 pages, some of which was searching cross-examination.

The court's examination of the appellant Black covers approximately 45 pages of the transcript. During the course of his extensive examination, the District Judge asked the following question:

"Q. Now, can you tell us where you find anywhere in this Exhibit 43 any reference directly or indirectly to the fact that this profit was realized except out of what the company received from conducting its business during the first six months of 1929?"

Upon objection made by counsel for the appellant Black that the document spoke for itself, and that the question called for a conclusion, the court said:

"The Court: Well, I am not going to insist upon the witness answering the question if you stand by that objection, but I will say, so that counsel may be apprised, why I asked:

"This jury will be called upon among other things, to make findings from all of the evidence—

"Mr. Peterson (Interrupting) True.

"The Court: (Continuing)—and if any inference—or, rather, if any inference may fairly be drawn from the exhibit, to which the witness' attention has been directed, other than that it is a statement to the effect that the profit referred to was realized out of the conduct of the business through the sale of the company's products, my thought would be that the witness should be afforded the opportunity of showing. While it is for the jury exclusively to find facts, I am very much impressed with the thought that without some statement from this witness, or some other, that the fair and only reasonable inference to be drawn from that exhibit is that the company had earned a profit of some $90,000 during the first six months of 1929 through the sale of its products, which was the only business in which it was engaged.

"*Now, I think your objection, if you insist upon it, ought to be sustained.*" (Italics our own.)

We think that the foregoing comment by the trial judge, made as it was in the presence of the jury, was entirely out of place. It was a clear attempt to justify a question that was admittedly improper, and it placed counsel in a position of apparently fearing to have Black express his opinion regarding the exhibit. The judge's speech entirely destroyed the effect of his correct ruling on the evidence.

The trial court's examination of Richard A. Bottenfield, a certified public accountant called by the appellee, took up 12 pages of the printed transcript. The lower court's apparent desire to assist the prosecution was shown in the attempt to put into the mouth of the witness words that would have been prejudicial to the appellant Black. The accountant was testifying on direct examination regarding a visit to the offices of the Hollywood Dry Corporation for the purpose of making an audit and the follow-

ing dialogue between the court and witness ensued:

"The Court: I mean, who identified you as being somebody who had any right to be there?

"The Witness: Well, I met—

"The Court: (Interrupting) In other words, you met Mr. Black?"

This was an obvious attempt to connect the appellant Black with the corporation's books, which were being offered in evidence. The witness, however, declined to be led, and replied that he had met Munton.

Other witnesses whom the District Judge examined at great length were Kenneth J. Hines, 6 pages; and Floyd R. Bekins, 4 pages. The court repeatedly took the direct examination of Bekins away from counsel for the appellee, ignoring defense objections to questions and answers, and conducting the examination in its own way.

In addition to the witnesses to whom we have referred, the District Judge examined a number of others, the questions and answers covering 12 pages of the printed transcript.

The appellee contends that the record fails to disclose that the appellants "objected to the Court's interrogation of the witnesses," or that "any exceptions [were] taken by the appellants arising out of the interrogation." If the appellee means that the appellants did not object or except to the *length* and *minuteness* of the examination conducted by the District Judge, the statement is probably correct. The appellants did, however, repeatedly object to questions propounded by the trial court, and exceptions were properly taken to adverse rulings on some of the objections.

Be that as it may, counsel are not held to strict accountability for failure to object or except when the questions are asked *by the court*. This point is well covered in the leading case on the subject, from which we are about to quote.

The appellant Williams suggests that "not once during the entire trial did the court interrupt the proceedings and examine any witness for the purpose of aiding the defense or breaking down the prosecution testimony." While replying that "The complete record of the Court's examination in the instant case, while of considerable length, has no earmarks of unfairness or unfriendly attitude toward the defendants,"

the appellee fails to point out a single instance in which the court's intervention in the questioning was to assist the defendants.

Our own examination of the record has convinced us that by far the major portion of the 200-page examination conducted by the District Judge—when such examination dealt with more than formal or preliminary matters—tended to aid the prosecution in proving its material contentions. Rare indeed were the instances in which the trial court came to the rescue of the defense. The court's insistent efforts to connect the appellants with the books and literature of the Hollywood Dry Corporation; its frequent and unnecessary interruptions of both direct and cross-examinations that were being competently conducted; and its lengthy and inquistorial cross-examination of the defendants, including the appellants themselves, all tended, we think, to convey to the jury—though no doubt inadvertently—the impression that the court was insisting upon a conviction.

The prejudicial effect of protracted questioning of witnesses by the trial judge, and the handicaps under which counsel labor in coping with such a situation, have been repeatedly emphasized in the decisions.

In the leading case of Adler v. United States, 5 Cir., 182 F. 464, 472, 473, the court said:

"The impartiality of the judge—his avoidance of the appearance of becoming the advocate of either one side or the other of the pending controversy which is required by the conflict of the evidence to be finally submitted to the jury—is a fundamental and essential rule of especial importance in criminal cases. The importance and power of his office, and the theory and rule requiring impartial conduct on his part, make his slightest action of great weight with the jury. While we are of opinion that the judge is permitted to take part impartially in the examination or cross-examination of witnesses, we can readily see that, if he takes upon himself the burden of the cross-examination of defendant's witnesses, when the government is represented by competent attorneys, and conducts the examination in a manner hostile to the defendant and the witnesses, the impression would probably be produced on the minds of the jury that the judge was of the fixed opinion that the defendant was guilty and should be convicted. This would not be fair

to the defendant, for he is entitled to the benefit of the presumption of innocence by both judge and jury till his guilt is proved. If the jury is inadvertently led to believe that the judge does not regard that presumption, they may also disregard it.

"A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge. *Besides, the defendant's counsel is placed at a disadvantage, as they might hesitate to make, objections and reserve exceptions to the judge's examination, because, if they make objections, unlike the effect of their objections to questions by opposing counsel, it will appear to the jury that there is direct conflict between them and the court.* If it were the function of the judge in this country, as it is in some foreign tribunals, to perform the duties incumbent here on the district attorney, the impression produced on the minds of the jury against the defendant would not be so *inevitable.* Counsel are expected to maintain an attitude of respect and deference toward the judge, and this attitude is maintained without difficulty when the judge confines his activities to the usual judicial duties. And the judge can more easily treat counsel with the respect due an officer of the court in the performance of a duty, *if he avoids the performance of the duties incumbent properly upon an attorney representing one side of the case.* The evidence, taken as a whole, might be so conclusive of the defendant's guilt that an appellate court would not be justified in interfering with the judgment on this account alone. *But in a case where there is substantial conflict in the evidence as to the essential points that were required to be submitted to the jury, the course of the judge in unnecessarily assuming to perform the duties incumbent primarily upon others might make it the duty of an appellate court, on this ground alone, to grant a new trial."* (Italics our own.)

Citing with approval the rule laid down in the Adler Case, supra, the court, in Frantz v. United States, 6 Cir., 62 F.2d 737, 739, said:

"Throughout the trial, lasting a number of days, the District Judge was quite evidently convinced of the guilt of the accused, and took no pains to avoid disclosure of this fact to the jury. In his examination and cross-examination of witnesses, in remarks in the presence of the jury as to the state of evidence upon certain issues, and in opinions he expressed as to other elements of testimony and the frequent reiteration of a question respecting the defendant's presence in the paying teller's cage, 'when all the shortages of interest failed to go through,' the trial judge inadvertently, we are sure, departed from that attitude of disinterestedness which we regard as the very foundation of a fair and impartial trial. We do not intend to hold, or even to imply, that a federal judge may not participate directly in both civil and criminal trials, or propound such questions to witnesses as seem to him essential to the proper development of the case, or express his personal opinion upon fact issues, but in so doing he should always be calmly judicial, dispassionate, and impartial. He should sedulously avoid all appearance of advocacy as to those questions which are ultimately to be submitted to the jury."

Again, in Hunter v. United States, 5 Cir., 62 F.2d 217, 220, the court used the following language:

"The assignments of error based on the district judge's cross-examination of appellant are in our opinion well taken. While that method of cross-examination, if it had been conducted by the district attorney, might have been proper, a district judge ought never to assume the role of a prosecuting attorney and lend the weight of his great influence to the side of the government. It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it, in the interests of justice, that the case is fairly tried. We refer with entire approval to what Judge Shelby, speaking for this court long ago, said on this subject in Adler v. United States, 182 F. 464. The only conclusion that could reasonably be drawn from the questions objected to was that the judge did not believe appellant was telling the truth about the amount or source of his income, but was thoroughly convinced and was attempting to demonstrate that appellant was deriving a large income from the illegal transportation and sale of liquor."

The extent to which a trial judge should examine witnesses was well expounded by the Supreme Court of California in People v. Boggess, 194 Cal. 212, 241, 228 P. 448, 460:

"There can be no doubt that it is the duty of the trial court, if the exigencies

of the occasion require it, to facilitate, by one or more proper interrogatories, the direct and cross examination of a witness. But for the court to repeatedly take the defendant as a witness out of the hands of his counsel, who, as the record before us shows, was apparently competent, conscientious, and expeditious in his conduct of the case, and proceed along an independent and extensive line of examination and cross-examination, is not only not commendable, but highly irregular, and for the sake of due and orderly administration of justice should not be indulged in. Ordinarily the proper course, and the one generally pursued, is to allow the examination by counsel—direct, cross, redirect, and recross—to conclude, and then, if anything in the judgment of the trial court remains obscure, which may be material for the jury to know, and it seems desirable that an examination of the witness should be further pressed, then, with perfect propriety, the trial court may, and indeed should, intervene so that the ends of justice may be subserved. This, however, should be done with care, particularly where the witness is the defendant in the case, lest the jury should, because of the court's intervention, and because of that fact alone, indulge in adverse inferences and conclusions from the testimony of the witness."

See, also, People v. Bernstein, 250 Ill. 63, 95 N.E. 50, 51; 70 C.J. 562, § 719; 5 C.J.S., Appeal and Error, 914, 915, § 1712b.

As we read the record—particularly the 200 pages comprising the District Judge's interrogation of witnesses—we are compelled to the conclusion that, in such questioning, the learned trial court passed beyond the immemorial limits set down for Anglo-American tribunals. Applying the language of the foregoing decisions, we believe that he took "upon himself the burden of the cross-examination of the defendant's witnesses, when the government [was] represented by competent attorneys." The District Judge furthermore repeatedly took the appellants out of the hands of their own "counsel, who, as the record before us shows, [were] apparently competent, conscientious and expeditious in [their] conduct of the case, and proceed[ed] along an independent and extensive line of examination and cross-examination." We believe that the District Judge did not "sedulously avoid all appearance of advocacy as to those questions which [were] ultimately to be submitted to the jury," but, on the contrary,

probably produced on the minds of the jury the impression "that the judge was of the fixed opinion that the defendant[s] [were] guilty and should be convicted." This being "a case where there is substantial conflict in the evidence as to the essential points that were required to be submitted to the jury, the course of the judge is unnecessarily assuming to perform the duties incumbent primarily upon others," makes it our duty to grant a new trial.

But we do not base our reversal of this case upon the foregoing ground alone. The appellants assign and specify as error that the court in its charge to the jury "erred in commenting upon the evidence * * * in that the comments amounted to an act of advocacy on the part of the court in favor of the prosecution, and in the said comments none of the evidence favorable to the defendants was stated."

■ Our examination of the instructions to the jury leads us to believe that the appellants have just cause to complain that the judge's charge was one-sided. For instance, 9 pages of the printed transcript are taken up with the court's summary of the indictment, each main heading of each summary being prefaced by the words, "the indictment charges and, in my opinion, there is evidence which, if believed, tends to prove," etc. Again, there are in the charge many pages devoted to summarizing evidence presented by the prosecution, while only meager, hurried, and passing reference is made to the case made by the defense, which called a dozen witnesses and offered in evidence 30 exhibits. Approximately 270 pages of the 656 pages of transcript of testimony are devoted to evidence submitted by the defense. Such volume of testimony, we think, deserved much fuller treatment at the hands of the court.

■ A federal trial judge need not summarize the evidence at all. But if he undertakes to do so, the summary must be fair and adequate. The authorities are agreed that it must not be one-sided.

Mr. Chief Justice Hughes, in Quercia v. United States, 289 U.S. 466, 470, 472, 53 S.Ct. 698, 699, 77 L.Ed. 1321, has well stated the correct rule on this subject:

"This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon

testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight,' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, *and especially that it should not be one-sided.*' * * *

"Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury and that if they did not agree with it they should find the defendant not guilty." (Italics our own.)

The definite limitation upon a judge's right to summarize the evidence was thus tersely stated by the court in Trefone v. United States, 10 Cir., 67 F.2d 954, 955:

"If the testimony is summed up or analyzed, care must be taken to sum up and analyze both sides."

See, also, Weare v. United States, 8 Cir., 1 F.2d 617, 619; Smith v. United States, 8 Cir., 18 F.2d 896, 897; Leslie v. United States, 10 Cir., 43 F.2d 288, 289; Minner v. United States, 10 Cir., 57 F.2d 506, 513; Hunter v. United States, supra, 62 F.2d 217, at page 220.

In but a single instance did the lower court refer extensively to any part of the defense testimony. *And that single instance was for the purpose of discrediting the testimony of the appellant Black.*

We refer to that portion of the lower court's instructions dealing with the $200,-000 note given by the Hollywood Dry Eastern Corporation, referred to elsewhere in this opinion. After quoting from Black's testimony, given during cross-examination conducted by the District Judge himself, the lower court compared that testimony with the evidence given by Munton and by Edwin B. Cassidy, a certified public accountant called by the appellee.

After reading from 17 pages of the transcript of record, the learned District Judge thus instructed the jury:

"Now, you will observe that in the testimony of defendant Black, he states that when this conversation took place with Mr. Cassidy both the note, Exhibit 29, and the extension agreement, Exhibit 30, were shown to the accountant. On the other hand, we have had the testimony of the accountant to the effect that he had never seen the extension agreement until the time of the so-called April-May, 1930, audit, and that extension agreement, which is Exhibit 30, made a vital difference in how the item might be carried.

"Now there is a conflict in the testimony between the defendant Black on the one hand and Mr. Cassidy on the other. But, you may take into consideration on the one hand whether or not Mr. Cassidy had any interest in anything to which he testified here, any interest in the outcome of this case, and whether the defendant Black has any interest that might motivate him in any way to depart from the truth of what occurred on that occasion.

"And then, over and beyond those considerations, you are to observe in the testimony of Mr. Munton, he not only tells that Mr. Black informed Mr. Cassidy that the note would be paid, but Munton makes no reference whatever to any extension agreement, Exhibit 30, being shown to Cassidy or anybody, and nothing was brought to Cassidy except the note itself."

This court has held that, even in a civil case, such singling out of defense testimony and comparing it with testimony adduced by the other side, with the intimation of "motivating interest," is prejudicial error. In Sacramento Suburban Fruit Lands Co. v. Jensen, 9 Cir., 36 F.2d 936, 937, the late Judge Rudkin said:

"The court returned to the testimony of the witness Traxler and added: 'Traxler says it was three hundred and fifty dollars an acre. He had 1,800 acres south of Rio Linda which he was selling at five hundred dollars an acre, two hundred and fifty dollars an acre, and up, the same variety and character of land, and he says he has sold out now but has stock. In weighing his testimony, as I told you a while ago, *take into consideration if he has any interest or motive to keep up the price of land higher than the real value, in determining his evidence.*' This was an attempt on the part of the court to discredit the witnesses for the appellant and disparage their testimony, while the testimony of the witness for the other side was commended. The language thus employed is the language of the advocate, not that fair and impartial presenta-

tion of the case which is absolutely indispensable, if the right of trial by jury is to be of any value to the citizen." (Italics supplied.)

Particularly objectionable is such singling out of the defendant's testimony when such testimony has been elicited on *cross-examination by the trial judge himself*. In Hunter v. United States, supra, 62 F.2d 217, at page 220, the court said:

"The judge's charge was not as objectionable as was his cross-examination of appellant, but it was erroneous in that it was one sided, and placed undue emphasis on the testimony of appellant which the judge himself had brought out by his questions. If the trial judge comments on the evidence, as he has a right to do, he should call attention to the evidence in favor of as well as against the accused."

In the instant case, the lower court already had instructed the jury that it would be proper to consider "the interest which such defendant may have in the case, his hopes and his fears, and what he has to gain or lose as a result of your verdict." The propriety of even such an instruction has been doubted by the Supreme Court. In Hicks v. United States, 150 U.S. 442, 452, 14 S.Ct. 144, 147, 37 L.Ed. 1137, that tribunal said:

"It is not unusual to warn juries that they should be careful in giving effect to the testimony of accomplices; and perhaps a judge cannot be considered as going out of his province in giving a similar caution as to the testimony of the accused person. Still it must be remembered that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability. The wise and humane provision of the law is that 'the person charged shall, at his own request, but not otherwise, be a *competent* witness.' The policy of this enactment should not be defeated by hostile comments of the trial judge, whose duty it is to give reasonable effect and force to the law."

See, also, Allison v. United States, 160 U.S. 203, 207, 208, 16 S.Ct. 252, 40 L.Ed. 395.

However that may be, it was clearly reversible error for the learned District Judge, after already having given the general instruction as to the defendant's interest in the case, to refer to it again in connection with the comparison with Cassidy's interest therein. As was said by Mr. Chief Justice Hughes in Quercia v. United States, supra, 289 U.S. 466, at page 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321, "It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf."

The closing language of the opinion in Hunter v. United States, supra, 62 F.2d 217, at page 220, is applicable to the lower court's activities in the instant case, both with respect to the examination of witnesses and the instructions to the jury:

"That the district judge did not intend to be unfair is beside the question. The case was tried in such a way that the jury, in considering as a whole the judge's questions and charge, might well have reached the conclusion that he was not impartial, but was insisting upon a conviction. It is vastly more important that the attitude of the trial judge should be impartial than that any particular defendant, however guilty he may be, should be convicted. It is too much to expect of human nature that a judge can actively and vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial."

Another specification of error deals with the asserted error of the lower court in overruling the separate demurrers to the indictment. We do not think that this specification possesses merit. The indictment sufficiently charges an offense against the United States.

The appellants also specify as errors the court's "abuse of discretion" in denying their motion for a bill of particulars. We do not concur in that contention. As the appellant Black correctly concedes in his brief, it is only when injury has resulted from the denial of a request for a bill of particulars "that the error is of such a nature that a reversal will be granted." In this connection, it should be remembered that the lower court ordered the defendants to "be permitted to examine such books and records of the corporation named in the indictment as may be in the possession of the United States Attorney or the Post Office Inspectors." We cannot say that the appellants were denied any substantial

rights by the court's denial of their request for a bill of particulars.

 Since we are reversing the case, and the other errors, if any, may not be repeated on a new trial, we need not discuss the remaining specifications. In the language of the late Judge Sawtelle, of this court, in Cossack v. United States, 9 Cir., 63 F.2d 511, 517:

"There are many other assignments of error relied upon by the appellant, relating to the refusal of the court to entertain an application for a continuance, relating to the instructions of the court on the grounds that they were partial, prejudicial, and argumentative, and, finally, relating to the admission of evidence during the trial. In view of the fact, however, that we are reversing the case on the foregoing specific ground, it would seem unnecessary to consider the other assigned errors. As was said by the court in Jacobs v. United States (C.C.A.1) 161 F. 694, 701, 'we feel justified in trusting to the probability, or, at least, to the possibility, that, on a new trial, they may all disappear.'"

See, also, Cady Lumber Co. v. Fain, 9 Cir., 65 F.2d 644, 646, certiorari denied 290 U.S. 674, 54 S.Ct. 92, 78 L.Ed. 582; United States v. Great Northern Ry. Co., 9 Cir., 68 F.2d 610, 612; Hunter v. United States, supra, 62 F.2d 217, at page 220.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.