# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-1920, 02-2260, 02-2356 & 02-2357

JAMES NEWSOME,

*Plaintiff-Appellee,*

v.

HELEN MCCABE (as personal representative of
the estate of JOHN MCCABE), RAYMOND MCNALLY,
and CITY OF CHICAGO,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 7680—**Paul E. Plunkett**, *Judge.*

———————

ARGUED JANUARY 8, 2003—DECIDED FEBRUARY 10, 2003

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and
DIANE P. WOOD, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*.  Fifteen years after his
conviction for killing Edward Cohen, James Newsome was
pardoned on the ground of innocence: fingerprints and
other information strongly imply that Dennis Emerson
committed the crime. Newsome filed this suit under 42
U.S.C. §1983, seeking damages from police officers who, he
contends, induced three witnesses to identify him as the
killer. Two years ago we held that officers McCabe and

McNally are not entitled to qualified immunity if, as Newsome alleges, they not only induced witnesses to accuse him falsely but also concealed their improper activities. *Newsome v. McCabe*, 256 F.3d 747, rehearing denied, 260 F.3d 824 (7th Cir. 2001). On remand the City of Chicago, which has a financial stake in the outcome as a potential indemnitor of the officers, intervened to protect its interests. A jury found that, by concealing evidence favorable to the defense, McCabe and McNally had violated Newsome's constitutional right to due process of law and awarded him $15 million in damages, to which the district judge (after denying all post-trial motions) added some $850,000 in attorneys' fees and costs. See 2002 U.S. Dist. LEXIS 6345 (Apr. 2, 2002), 2002 U.S. Dist. LEXIS 8793 (May 15, 2002). In this appeal Chicago does not dispute the legal accuracy of the jury charge, does not contend that the evidence was inadequate to support the verdict, and does not argue that the financial awards are excessive. Instead it asserts official immunity, and it also contests some of the district judge's evidentiary decisions at trial.

Many of Chicago's contentions are variations (or recapitulations) of arguments that we found unconvincing the last time around. Chicago thus has preserved them for presentation to a higher court, but in this tribunal they are barred by the law of the case. Chicago's presentation effectively asks us to use a claim of immunity to resolve the case *de novo* on appeal, discarding the rule that a jury's verdict must be sustained if the evidence (and reasonable inferences), when viewed in the light most favorable to the prevailing party, would permit a reasonable juror to find in that party's favor. According to Chicago, two legal propositions call for independent appellate review: first, a claim of immunity presents a question of law for the court, see *Rakovich v. Wade*, 850 F.2d 1180, 1204 (7th Cir. 1988) (en banc); second, as part of the immunity inquiry, a court

considers whether a constitutional violation occurred. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Anthony Rounds, Josie Nash, and John Williams supplied the principal evidence at Newsome's criminal trial. Rounds and Nash, who had been in Cohen's grocery store when the murder occurred, positively identified Newsome as the killer; Williams, who had been outside, testified that he saw Newsome flee. By the time of the civil trial more than 20 years later, Nash had died and Williams could not be found, but Rounds denounced his earlier testimony as the result of insistence by McCabe and McNally that he select No. 3 (Newsome) in a lineup; and Newsome testified that he saw the officers coach the witnesses during the lineups. The officers admitted (as Williams had testified during a suppression hearing) that they improperly displayed photos before the lineup occurred to improve the chance that Williams would pick Newsome. Chicago wants us to disbelieve the testimony Rounds gave at the civil trial, or at least give an innocent reading to his testimony that the officers threatened him with imprisonment if he told the prosecutors what actually happened at the lineup. According to the City, all McCabe and McNally meant is that Rounds faced criminal investigation unless he told the whole truth—a standard warning to witnesses who spin out inconsistent tales.

Claims of qualified immunity neither require nor authorize *de nov*o appellate review of the evidence. The Supreme Court made this clear: "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201 (emphasis added). This question is for bench rather than jury, and the court of appeals does not defer to the district judge's resolution of it—but just as with motions for summary judgment under Fed. R. Civ. P. 56, or for judg-

ment as a matter of law under Fed. R. Civ. P. 50, what the court decides is whether the record could support a finding of unconstitutional conduct. See *Johnson v. Jones*, 515 U.S. 304, 313 (1995). To say that a motion for judgment as a matter of law under Rule 50 is addressed to the court does not imply that the court resolves factual disputes; just so with claims of official immunity. *Saucier* made the existence of a constitutional tort the initial inquiry because it's pointless to decide whether the impropriety of a public actor's conduct was clearly established at the time the conduct occurred, if the conduct was not improper at all. In other words, unless the plaintiff's complaint rests on a good legal theory, and the record presents a triable issue under that theory, the defendant is entitled to prevail expeditiously. When the legal theory is sound, however, and there is a material dispute about the strength of the evidence, then the case must be tried, and the jury's resolution is conclusive. If an interlocutory review tests only the sufficiency of the complaint, a later review may be required to test the sufficiency of the evidence, see *Behrens v. Pelletier*, 516 U.S. 299 (1996)—but, as with any other appellate review under Rules 50 or 56, the prevailing party receives the benefit of all reasonable credibility determinations and inferences.

This jury heard Rounds. It knew that he was contradicting testimony given at Newsome's criminal trial; it knew that Rounds is not the most savory character. But just as many a criminal defendant goes to prison on the testimony of former partners in crime who say that they have at last gone straight, so a jury could believe these witnesses when they decided to sing in a new key. And Rounds' testimony about the warning, taken in the light most favorable to the verdict, permitted the jury to find that McCabe and McNally not only manipulated the identifications (something that would not by itself support an award of damages, as our opinion denying rehearing in 2001 explained) but

also obstructed the ability of the prosecutors and defense counsel to get at the truth in the criminal trial—which *does* support the jury's verdict.

Seeking a way around our decision that the officers are not entitled to qualified immunity, Chicago now contends that they should have received *absolute* immunity. The theory is that Newsome effectively accuses the officers of suborning perjury. Witnesses enjoy absolute immunity from civil liability on account of their testimony, see *Briscoe v. LaHue*, 460 U.S. 325 (1983), and that immunity also covers preparation. "It would be a hollow immunity if the aggrieved party could turn around and say, in effect: 'True, your *delivery* of bad testimony is immunized, but preparing to deliver that testimony is not, so I can litigate the substance of your testimony.' Substance is exactly what *Briscoe* puts off limits." *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1245 (7th Cir. 1990) (emphasis in original), reversed in part on other grounds (after an intermediate remand), 509 U.S. 259 (1993). Now Chicago contends that testimonial immunity should be extended to non-witnesses who assisted in the testimony's preparation. We rejected that extension in *Ienco v. Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002), and see no reason to revisit that issue because Newsome's case does not present it. McCabe and McNally were not held liable for conspiring with the eyewitnesses to commit perjury; their liability is under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger Newsome. By the time of trial, Rounds, Nash, and Williams may have sincerely believed that Newsome was the murderer. They did not need immunity; instead they (and Newsome) needed protection from steps that took advantage of memory's frailty, and Newsome's lawyers needed (but did not receive) information vital to probe whether manipulation occurred.

Most persons have difficulty remembering or describing the features of strangers. A person who sees a criminal for

only a brief time takes away a vague sense of appearance and behavior—and that sense may be focused by a sketch, photograph, showup, or lineup after the events. Sometimes the witness zeroes in on the correct person, sometimes not; there is an element of chance and an opportunity for manipulation. Once the witness decides that "X is it" the view may be unshakable. Psychological research has established that the witness's faith is equally strong whether or not the identification is correct. We described these findings in *Krist v. Eli Lilly & Co.*, 897 F.2d 293 (7th Cir. 1990): "An important body of psychological research undermines the lay intuition that confident memories of salient experiences . . . are accurate and do not fade with time unless a person's memory has some pathological impairment. . . . The basic problem about testimony from memory is that most of our recollections are not verifiable. The only warrant for them is our certitude, and certitude is not a reliable test of certainty. . . . [T]he mere fact that we remember something with great confidence is not a powerful warrant for thinking it true." 897 F.2d at 296-97 (citations to the scholarly literature omitted). See Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* (3d ed. 1997); Elizabeth F. Loftus, *Eyewitness Testimony* (1979; rev. ed. 1996); Daniel L. Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 112-37 (2001). See also *United States v. Hall*, 165 F.3d 1095, 1118-20 (7th Cir. 1999) (concurring opinion). Jurors, however, tend to think that witnesses' memories are reliable (because jurors are confident of their own), and this gap between the actual error rate and the jurors' heavy reliance on eyewitness testimony sets the stage for erroneous convictions when (as in Newsome's prosecution) everything depends on uncorroborated eyewitness testimony by people who do not know the accused. This is why it is vital that evidence about how photo spreads, showups, and lineups are conducted be provided to defense counsel and

the court. It is also why the constitutional violation justifying an award of damages is not the conduct of the lineups but the concealment of evidence about them. Secreting evidence is not covered by absolute immunity.

Because recollection is suggestible, it was important in this civil case to explore the question whether the testimony of Rounds, Nash, and Williams identifying Newsome at the criminal trial was attributable to deliberate manipulation or instead to chance. For if chance errors are to blame, and the witnesses would have identified Newsome no matter how the officers prompted them during the lineups, then defendants' conduct did not cause the wrongful conviction and an award of damages would be improper. To explore this issue Newsome presented the testimony of Gary Wells, a professor of psychology who has performed experiments and written scholarly works in this field. See, e.g., Gary L. Wells & Elizabeth A. Olson, *Eyewitness Identification*, 54 Ann. Rev. Psych. 277 (2003); Gary L. Wells, *Eyewitness Identification: A System Handbook* (1988). Wells conducted an experiment to determine the likelihood that three persons who saw Emerson nonetheless would identify Newsome. He showed two panels of subjects different pictures of Emerson for 15 seconds then, after some time had passed, showed them pictures of the men in the lineup and asked them to choose the one they had seen in the initial photograph. Of 50 members on the first panel, none selected Newsome's photo; of 500 members on the second panel (which was shown a different photo of Emerson), 15 chose Newsome's photo. Performing a chi-square test, Wells calculated that the probability of all three eyewitnesses independently picking Newsome out of a lineup by chance error was substantially less than one in 1,000, implying that the officers must have manipulated their identifications.

Chicago asked the district judge to exclude Wells' testimony under Fed. R. Evid. 702, which as amended in 2000

codifies (with some variation) the holding of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district judge concluded that Wells is an expert on the subject of identification, that his testimony was based on sufficient data, that his methods were reliable by the standards of the field, and that he applied these methods reliably to the facts of Newsome's case. Experiments of the kind that Wells performed are the norm in this branch of science and have met the standard for scholarly publication and acceptance. There were of course potential problems. For example, Wells assumed that Emerson is the killer, so that the witnesses saw him; if anyone other than Emerson committed the murder, the test is invalid. Wells was candid about this vital assumption, which was open to probing and argument by the defendants. Wells also assumed that two-dimensional images (pictures) yield the same effects on memory as three-dimensional views (live action in the victim's grocery store; lineups in the police station; identifications in open court). This may or may not hold, but the claim of equivalence was open to exploration at trial, and it is hard to see what else Wells could have done. Even if he could have conscripted Emerson and the lineup participants for an experiment, time has so altered their appearance since the events of October 1979 that the results would have been unreliable. Chicago does not contend that there was a better way to find out whether Rounds, Nash, and Williams would have identified Newsome without the coaching. Instead it insists that Wells' testimony was irrelevant because he did not determine *how* the witnesses had been induced to believe that they saw Newsome commit the murder. Yet testimony need not prove everything in order to be useful. As we have said, the jury had to consider the possibility that unhappy chance rather than malfeasance led to the mistaken conviction. Wells provided information valuable in this endeavor. Appellate review of the district judge's decision is deferential, *General Electric Corp. v.*

*Joiner*, 522 U.S. 136 (1997), and there was no abuse here; indeed, we would have acted precisely as did the district judge. As *Hall* explains, it may be prudent to avoid complicating criminal trials with general scientific evidence about the psychology of identification—though scientific evidence that a given person deviates from the norm (for example, is exceptionally suggestible) may be invaluable. See *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996). No matter how criminal trials should be managed to keep the jurors' minds on the main event, however, Wells' testimony was not a distraction in this civil proceeding but went to an important ingredient of the plaintiff's claim.

Chicago presents several other objections to the district judge's handling of the trial. These do not require separate discussion; all were treated thoughtfully in Judge Plunkett's post-trial opinion, and we substantially agree with his disposition of them. He did not separately discuss the City's request for monetary sanctions on account of Newsome's failure to reveal his arrest on heroin charges two weeks before the civil trial, his loss of employment as a paralegal, and thus his perjury at trial when he described himself as gainfully employed (which enabled counsel to argue that Newsome is a model citizen who rose above a disordered youth). Yet the district judge did conclude that Newsome's deceit does not require a new trial—a decision that Chicago no longer contests—and it was not necessary to discuss separately the possibility that a financial sanction might have been appropriate. It is not clear to us that Chicago adequately alerted the district judge to this possibility (the record does not contain a formal motion seeking monetary sanctions, see Fed. R. Civ. P. 37(c)(1)); but whether it did or not, there was no abuse of discretion in the judge's resolution, even if we might have handled this issue differently.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*