UNITED STATES of America

v.

Andreas Jejuan SMITH.

Criminal Action No. 07cr165.

United States District Court,
M.D. Alabama,
Northern Division.

May 26, 2009.

Kevin L. Butler, Christine Ann Freeman, Aylia McKee, Federal Defenders, Middle District of Alabama, Richard Kelly Keith, Keith & Dubin, P.C., Montgomery, AL, for Andreas JeJuan Smith.

Jerusha Tatiana Adams, Louis V. Franklin, Sr., Tommie Brown Hardwick, U.S. Attorney's Office, Montgomery, AL, for United States of America.

## OPINION

MYRON H. THOMPSON, District Judge.

At trial, the United States moved to exclude the testimony of Dr. Sol Fulero, whom defendant Andreas JeJuan Smith offered as an expert on eyewitness identifi-

cations generally and cross-racial identifications in particular. The government relied on two evidentiary rules to exclude this testimony. First, it asserted that the testimony violated Fed.R.Evid. 702. Second, it argued that this testimony violated Fed.R.Evid. 403 because its prejudicial value substantially outweighed its probative value. The government's motion was denied in part (allowing Fulero to give his opinion about the science of eyewitness-identifications) and granted in part (not permitting Fulero to testify about specific witnesses in this case). The court promised that a written opinion setting forth its reasoning in more detail would follow, and this is that opinion.

## I. BACKGROUND

On June 22, 2007, Montgomery Police responded to a report of a bank robbery at Compass Bank. After several weeks, police identified the robber as Smith and a warrant was issued for his arrest. When a United States Marshal Service task force went to arrest Smith at a friend's home, two shots were fired at arresting officers from inside. Fortunately, neither officer at the door was harmed.

Based on the above events, Smith was charged with armed robbery; assault of a federal officer; carrying a firearm during a crime of violence (the assault of a federal officer); and being a felon in possession of a firearm. A jury found Smith guilty of bank robbery and illegally possessing a firearm, but acquitted him of assaulting a federal officer and carrying a firearm during a crime of violence.

Dr. Fulero's expert testimony went principally to the reliability of witness identifications of Smith as the bank robber. While Smith was found guilty of the robbery after the court allowed Fulero's expert testimony, the court believes that an opinion setting forth its reasoning for allowing the testimony is still warranted.

## II. DISCUSSION

The issue before the court is a pressing one. Eyewitness testimony has long been recognized as one of the most persuasive forms of evidence in criminal cases. "[T]here is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders,* 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) (internal citation and emphasis omitted); Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony,* 2 Fed. Cts. L.Rev. 2 (2007) ("'[S]eeing is believing' is not only ubiquitous common parlance but also appears to be gospel to jurors."); *see also Manson v. Brathwaite,* 432 U.S. 98, 120, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (Marshall, J., dissenting) (stating that "juries unfortunately are often unduly receptive to [identification] evidence").

Despite eyewitness testimony's persuasive nature, mounting evidence has suggested that it is not as reliable as has often been assumed. *See* Hon. D. Duff McKee, *Challenge to Eyewitness Identification Through Expert Testimony,* 35 Am.Jur. Proof of Facts 3d 1, § 1 (1996) ("Eyewitness testimony may be the least reliable, and yet the most compelling.") By some estimates, roughly 84% of convicts who have been exonerated by DNA testing were convicted on the basis of mistaken eyewitness testimony. Barry Scheck, et al., *Actual Innocence Five Days To Execution, and Other Dispatches From the Wrongly Convicted* (2000) (finding mistaken eyewitnesses as a factor in 84% of 67 wrongful convictions), *as cited in* Fradella, 2 Fed. Cts. L.Rev. at 2 n. 2; *see also*

Edward Connors, et al., *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence after Trial* (Dept. of Justice 1996) (examining 28 cases in which DNA evidence exonerated a defendant and stating that, "In all 28 cases, without the benefit of DNA evidence, the triers of fact had to rely on eyewitness testimony, which turned out to be inaccurate"), *available at* http://www.ncjrs.gov/txtfiles/dnaevid.txt (last visited May 21, 2009). There is, then, a vast lacuna between jurors' perceptions of the power of eyewitness testimony and this testimony's accuracy.

Still, despite this gap, courts have sometimes looked askance at expert testimony on the factors that can influence eyewitnesses' perceptions. In *United States v. Amaral*, 488 F.2d 1148, 1152–54 (9th Cir. 1973), the Ninth Circuit Court of Appeals upheld a district court's decision to exclude eyewitness-identification expert testimony, reasoning that cross-examination would unveil any weaknesses in identifications. A number of other older cases, including from Eleventh Circuit Court of Appeals, also have upheld rejections of similar evidence. *See, e.g., United States v. Holloway*, 971 F.2d 675, 679 (11th Cir. 1992) (relying on *Thevis, infra* ); *United States v. Purham*, 725 F.2d 450, 454 (8th Cir.1984) (concluding that the issue was within the province of the jury); *United States v. Thevis*, 665 F.2d 616, 641–42 (5th Cir.1982) (reasoning that problems with this testimony could be revealed through cross-examination and citing a then-"uniform disapproval" of similar testimony in other circuits); *United States v. Fosher*, 590 F.2d 381, 382–84 (1st Cir.1979) (ruling that the testimony would be prejudicial).

Yet, as the body of evidence has grown showing the unreliability of some eyewitness testimony, courts have gradually recognized the potential value of expert testimony on this subject. *United States v. Mathis*, 264 F.3d 321, 339–40 (3rd Cir. 2001) (examining an eyewitness expert's methods and "welcom[ing]" such testimony); *United States v. Smithers*, 212 F.3d 306, 311–18 (6th Cir.2000) (finding that a district court erred in not admitting eyewitness-identification expert testimony from Dr. Sol Fulero); *United States v. Moore*, 786 F.2d 1308, 1313 (5th Cir.1986) (finding that, under some circumstances, eyewitness-identification expert testimony "properly may be encouraged"); *United States v. Downing*, 753 F.2d 1224, 1232 (3d Cir.1985) (reasoning that "expert testimony on eyewitness perception and memory [should] be admitted at least in some circumstances"); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir.1984) ("The day may have arrived, therefore, when Dr. Fulero's testimony can be said to conform to a generally accepted explanatory theory.").

It has been over a decade since the Eleventh Circuit last addressed the admissibility of eyewitness-identification expert testimony in a published opinion. In *United States v. Smith*, 122 F.3d 1355, 1358 (11th Cir.1997), the Eleventh Circuit held that "a district court does not abuse its discretion when it excludes expert testimony on eyewitness identification." Before that decision, the "established rule" of the Eleventh Circuit was apparently that such testimony was not admissible. *Holloway*, 971 F.2d at 679; *see also United States v. Benitez*, 741 F.2d 1312, 1315 (11th Cir. 1984) ("[Defendant's] contention that the district court incorrectly excluded expert testimony concerning identification also lacks merit because such testimony is not admissible in this circuit.").

While *Smith* acknowledged that eyewitness-identification expert testimony has been looked upon "unfavorably" in the Eleventh Circuit, 122 F.3d at 1357, the

court explicitly declined to decide at that time whether the "per se inadmissibility rule" remained in effect. *Id.* at 1358. The court also emphasized that the decision whether to admit expert testimony rests within the discretion of the trial court. *Id.* at 1359.

■ A per se proscription against all eyewitness-identification expert testimony is irreconcilable with the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). There, the Court eschewed such categorical prohibitions of entire classes of expert *conclusions*; in determining whether to admit testimony, the Court stated, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. The Court emphasized that this inquiry is "a flexible one," *id.* at 594, 113 S.Ct. 2786, and provided a nonexhaustive list of factors for lower courts to consider when determining whether to admit proposed expert testimony as reliable and helpful under Fed.R.Evid. 702. *Id.* at 593–94, 113 S.Ct. 2786.

Heeding the Supreme Court's command, this court at trial examined whether the proposed expert testimony complied with the strictures outlined in *Daubert. See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) ("[T]he Supreme Court made abundantly clear in *Daubert* [that] Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence.") (citing *Daubert*, 509 U.S. at 589 n. 7, 113 S.Ct. 2786).

### A. Rule 702

Fed.R.Evid. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In *Daubert*, the Supreme Court urged lower courts, first, to examine whether reliable methodology undergirds proposed expert testimony. That is, courts are to consider: whether the theory or technique "can be (and has been tested)," "whether the theory or technique has been subjected to peer review and publication," whether there is a known or potential error rate in the scientific technique, and whether the theory or technique has achieved general acceptance in the particular scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786. Second, if the opinion testimony is reliable, the court must determine whether the testimony would aid the trier of fact. *Id.* at 589, 113 S.Ct. 2786. This, essentially, is nothing more than a restatement of the general rule that the trial judge ensure the evidence is "relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786. To answer this second question, courts should look to whether the reliable scientific methods "fit" the case before a court, *id.* at 591, 113 S.Ct. 2786, an inquiry that typically involves scrutinizing the particular testimony offered and matching that testimony to the specific factual context of a case. The government challenges the admission of Fulero's testimony at each of these stages.[1]

1. In *Smith*, 122 F.3d 1355 (11th Cir.1997),     because the parties did not dispute the issue,

### 1. Reliability

■ The government argues that Dr. Fulero's opinion does not constitute reliable scientific or technical knowledge. In support of this position, the government cites a host of cases from other circuits in which eyewitness-identification expert testimony has been rejected as unscientific. However, the purported experts in those cases failed to provide sufficient articles or data demonstrating the reliability of the methods employed by those experts. *E.g., United States v. Kime,* 99 F.3d 870, 883 (8th Cir.1996) (finding that two articles on the topic of eyewitness identification in lineups were "utterly deficient in regard to determining whether [the expert's] views constitute 'scientific knowledge' within the meaning of *Daubert*"); *United States v. Rincon,* 28 F.3d 921, 923–25 (9th Cir.1994) (affirming the district court's exclusion of proffered eyewitness-identification expert testimony under *Daubert* and noting that, "while the article identified the research on some of the topics, it did not discuss the research in sufficient detail that the district court could determine if the research was scientifically valid"); *United States v. Brien,* 59 F.3d 274, 277 (1st Cir.1995) (affirming the inadmissibility of expert testimony on the reliability of eyewitness identification, noting that the defendant failed to provide "data or literature underlying" the expert's opinion).

On the other hand, other courts have specifically reviewed Dr. Fulero's methods and found that they "easily" satisfy the first *Daubert* inquiry. *United States v. Moonda,* No. 1:06CR0395, 2007 WL 1875861 (N.D.Ohio June 28, 2007) (Dowd, J.). Indeed, in *United States v. Langan,*

263 F.3d 613 (6th Cir.2001), the Sixth Circuit Court of Appeals refers to Fulero as the expert "whose 'qualifications and scientific methods' [have] already been 'praised' by the Sixth Circuit." *Id.* at 623 (citing *Smithers,* 212 F.3d at 315).

This court concurred at trial with the cases and thus concluded that Fulero's methods satisfied the reliability prong of *Daubert.* In compliance with *Daubert,* the theories underlying Fulero's testimony have been well-tested in peer-reviewed publications, including in articles authored by Fulero. *See, e.g.,* Nancy Steblay, Jennifer Dysart, Sol Fulero, & R.C.L. Lindsay, *A Meta–Analytic Comparison of Showup and Lineup Identification Accuracy,* 27 Law & Hum. Behav. 523 (2003); Nancy Steblay, R.C.L. Lindsay, Sol Fulero, & Jennifer Dysart, *Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: A Meta-analytic Review,* 25 Law & Hum. Behav. 459–474 (2001); *see also* R.C.L. Lindsay & Gary L. Wells, *Improving Eyewitness Identification from Lineups: Simultaneous Versus Sequential Lineup Presentations,* 70 J. Applied Psychol. 556 (1985).

Furthermore, Fulero testified that the methods he relies upon are generally accepted, and this representation accords with this court's own findings. *See Frazier,* 387 F.3d at 1261 ("[T]he trial court's gatekeeping function requires more than simply taking the expert's word for it.") (internal quotations omitted). Numerous studies have been done under controlled conditions assessing the factors that influence eyewitnesses "in accordance with generally accepted practice in the behav-

---

the court did not address the district court's ruling, based on the first prong of *Daubert*'s analysis, that the eyewitness-identification expert testimony was valid scientific knowledge. 122 F.3d at 1358. The court addressed only whether the prior holding in *Thevis* bound it

to conclude, under the second prong of the *Daubert* test, that the district court did not abuse its discretion by denying admission of the evidence on the ground that the expert testimony would not assist the jury.

ioral science community" done independent of any litigation. Hon. Robert P. Murrian, *The Admissibility of Expert Eyewitness Testimony Under the Federal Rules*, 29 Cumb. L.Rev. 379, 384–85 (1999) (collecting studies). As the Department of Justice recognized in a 1999 guide, "research psychologists have produced a substantial body of findings regarding eyewitness evidence. These findings offer the legal system a valuable body of empirical knowledge in the area of eyewitness evidence." U.S. Dept. of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* 1 (1999), *available at* http://www.ncjrs.gov/pdffiles1/nij/178240.pdf (last visited Mar. 28, 2008); *cf. Illinois v. Lidster*, 540 U.S. 419, 425, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (citing the Department of Justice guide). The Department of Justice guide relied in part on an article co-authored by the proffered expert in this case. U.S. Dept. of Justice, 42 (citing Gary L. Wells, Mark Small, Steven D. Penrod, Roy S. Malpass, Sol M. Fulero, & Elizabeth Brimacombe, *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law and Human Behavior 603 (1998)).

Also of note is that Fulero holds a Ph.D. in psychology and now teaches the subject at the university-level. He has additionally demonstrated extensive knowledge of the ongoing, most recent developments in the field of eyewitness identification. Indeed, Fulero has authored or co-authored roughly 60 publications, primarily addressing how psychological factors affect the administration of criminal justice. Further, he is a reviewer for several major journals, including, among others, Law & Hum. Behav., J. of Forensic Psychol. & Prac., and Psychol. Pub. Pol'y & Law. *See generally City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (requiring that experts be "qualified to testify competently" on a given subject

matter); *see also* Michael R. Leippe, *The Case for Expert Testimony about Eyewitness Memory*, 1 Psychol. Pub. Pol'y & L. 909, 951 (1995) (encouraging courts to consider, prior to admitting an eyewitness-identification expert, whether he or she has: "(a) a PhD degree in psychology; (b) documentable extensive graduate-level training in cognitive, social, and other areas of experimental psychology; and (c) evidence of recent and ongoing comprehensive, cutting-edge contact with the eyewitness literature (e.g., research and publication, university-level teaching, reviewing for major journals).") These facts satisfied the court that Fulero is qualified in the field and equipped to provide the jury with reliable expert testimony on eyewitness identifications.

### 2. Assistance to the Jury

■ The United States contended that Fulero's proposed testimony would not aid the jury because Fulero's proffered testimony presented no analysis from Fulero tailored to this case. *See Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (stating that testimony must "fit" the facts of a case to satisfy Fed.R.Evid. 702). Instead, Fulero's testimony would discuss only general problems associated with eyewitness identifications. Such testimony, the government argued, would not aid the jury because problems with eyewitness identification are within the "ordinary knowledge of most lay jurors." *See Langan*, 263 F.3d at 624. In addition to the lack of support for the proposition that juries commonly understand the unnamed (but likely myriad) problems with eyewitness testimony or the ways in which those problems interact with each other and in different factual settings, a further problem with the government's argument was that Fulero's expert testimony actually fitted quite well to Smith's case.

The government's more categorical position, though, finds some support in Eleventh Circuit precedent. In *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir.1982) (Unit B),[2] the appellate court held that a district court did not abuse its discretion in refusing to admit expert testimony regarding eyewitness reliability. The court in *Thevis* expressed concern about opening the floodgates of psychological evidence and concluded that "the problems of perception and memory can be adequately addressed in cross-examination and that the jury can adequately weigh these problems through common-sense evaluation." *Id.*; *see also United States v. Smith*, 122 F.3d 1355, 1357 (11th Cir.1997) (explaining *Thevis*). As noted earlier, the per se rule apparently adopted after *Thevis* that such testimony is categorically inadmissible cannot survive (at the very least) the first prong of analysis mandated by the Supreme Court's decision in *Daubert*. *Smith*, however, while declining to address whether the first prong of *Daubert*'s analysis invalidated the per se rule, held that *Thevis* controlled its decision because the decision to exclude the expert testimony was consistent with *Daubert*'s second prong; that is, *Daubert* did not make it an abuse of discretion to find that eyewitness-identification expert testimony would not have assisted the juries in *Thevis* or *Smith*. Thus, *Smith* held that circuit precedent mandated the conclusion "that a district court does not abuse its discretion in excluding such testimony." *Id.* at 1359.

This result was confirmed by the recent unpublished opinion in *United States v. Smith*, 148 Fed.Appx. 867 (11th Cir.2005). In that case, the panel indicated that the defendant had produced evidence that undermined the rationale of *Thevis*, but wrote that the court felt limited by the prior panel precedent rule to uphold the rule that a district judge did not abuse her discretion by excluding such evidence.

Neither *Smith* nor *Thevis* addressed, however, whether a district court abuses its discretion by *admitting* this evidence pursuant to the analysis required by Rule 702 and *Daubert*.[3] This court concludes, after significant deliberation, that it does not. A contrary conclusion would be nothing short of untenable in light of the discretion of courts to admit expert testimony that would help factfinders reach more accurate results, recent developments in our understanding of the human mind in the 23 years since *Thevis*, and the unlikely salience of that new but robust scientific knowledge among factfinders. As a result, the court will explain in detail why, in the context of this case, it admitted the reliable and relevant expert testimony.

This is precisely the type of case in which eyewitness-identification expert testimony would be of particular use. The strongest evidence that Smith committed the armed bank robbery was two eyewit-

---

**2.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**3.** The holding in *Thevis*, which bound the court in *Smith*, is not similarly binding here. *See Anders v. Hometown Mortg. Servs.*, 346 F.3d 1024, 1031 (11th Cir.2003) (citing *Watts v. BellSouth Telcomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir.2003) ("Judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."), and explaining that, while *Smith* confirmed that the prior panel precedent rule obligates the court to follow the holdings of an earlier decision, 122 F.3d at 1359, "the holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision," *United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir.2000) (citation and internal quotation marks omitted)).

ness identifications by individuals who had had little contact with him. The videotape evidence in this case was, at best, inconclusive. *See United States v. Smithers*, 212 F.3d 306, 317 (6th Cir.2000)("[E]xpert testimony should be admitted ... when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications."); *United States v. Moore*, 786 F.2d 1308, 1313 (5th Cir.1986) ("[I]n a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged ...").

Importantly, Fulero was not permitted to testify about what weight the jury should give the testimony in this case. Rather, he was allowed to supply jurors with information about some specific factors that, according to well-established social science-research, impact witness accuracy and, as a result, might assist them in their own determination of the facts. Chief among these factors is the information concerning cross-racial eyewitness identifications; the evidence concerning the reliability of such identification is stunning and robust and, of crucial importance here, not likely well understood by juries. In addition, the expert evidence also indicates that the accuracy of identifications, including cross-racial identifications, is impacted by whether the witness perceived the event in a high-stress environment and whether the witness has subsequently been exposed to facts that potentially altered his or her memory of an event.

The jury's decision-making process can be enhanced by learning how these factors combine to impact perception and memory.

For example, here, one of the government's eyewitnesses is white, and the defendant is black. Research shows that cross-racial identifications are less accurate than same-race identifications.[4] Brandon L. Garrett, *Judging Innocence*, 108 Colum. L.Rev. 55, 79 (2008) ("Social science studies have long shown that cross-racial identifications are particularly error prone."); Gary L. Wells & Elizabeth A. Olson, *The Other–Race Effect in Eyewitness Identification: What Do We Do About It?*, 7 Psychol. Pub. Pol'y & L. 230, 231 (2001) ("[A] Black innocent suspect has a 56% greater chance of being misidentified by a White eyewitness than by a Black eyewitness."); Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own–Race Bias in Memory for Faces: A Meta–Analytic Review*, 7 Psychol. Pub. Pol'y & L. 3, 5–13 (2001) (reviewing literature showing that the chances of a mistaken identification is 1.56 times greater in the cross-race context than the same-race context); Heather M. Kleider & Stephen D. Goldinger, *Stereotyping Ricochet: Complex Effects of Racial Distinctiveness on Identification Accuracy*, 25 Law & Hum. Behav. 605 (2001) (finding that cross-racial identifications are generally less accurate than same-race identifications); Frederic Woocher, Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan. L.Rev. 969, 982 (1977) ("considerable evidence indicates that people are poorer at identifying members of another race than of their own"). Recent evidence also shows that cross-racial identifications are even more error-prone when, as was true here, one of the eyewitnesses is white and

---

**4.** Indeed, "48% of exonerees convicted based on eyewitness testimony [are] identified cross-racially." Garrett, 108 Colum. L.Rev. at 79 (citing Innocence Project, 200 Exonerated: Too Many Wrongfully Convicted 20–21, *available at* http://www.innocenceproject.org/200/ip_200.pdf (last visited May. 21, 2009)).

the suspect is black. Fradella, 2 Fed. Cts. at 14 ("The result of cross-racial bias is a higher rate of false positive identifications, especially when a Caucasian eyewitness identifies an African–American suspect."); *see also* Sheri Lynn Johnson, *Cross–Racial Identification Errors in Criminal Cases,* 69 Cornell L.Rev. 934, 938–40 (1984) (noting that research has repeatedly found that whites are more accurate in identifying white faces than black faces).

The potential inaccuracies of cross-racial identifications are not necessarily within the common knowledge of the average juror or, for that matter, the average judge. *See Commonwealth v. Zimmerman,* 441 Mass. 146, 804 N.E.2d 336, 344 (2004) (Cordy, J., concurring) (the unreliability of cross-racial identification is a subject "beyond the ordinary experience and knowledge of the average juror") (internal quotations omitted). The Supreme Court of New Jersey, in fact, requires jury instructions on the potential unreliability of cross-racial identifications for that reason. *State v. Cromedy,* 158 N.J. 112, 128, 727 A.2d 457 (1999).

Fulero also testified about how stress can impair a witness's perceptions and memories. One of the government's eyewitnesses testified that the bank robbery was the most traumatic experience of her life. Particularly in combination with the evidence about cross-racial · identification, the jurors' judgment could be enhanced by learning that trauma and fear can cause a sincere person to wrongly recall an event. C. Neil Macrae et al., *Creating Memory Illusions: Expectancy–Based Processing and the Generation of False Memories,* 10 Memory 63, 72, 76–77 (2002) (finding that stress impairs an individuals perception and ability to accurately recall an event), *as cited in* Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decision-making, and Misremembering,* 57 Duke

L.J. 345, 379 n. 178 (2007); Elizabeth Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* 11 (2d ed. 1992) (explaining that fear and stress impair perceptions) *as cited in* Peter J. Cohen, *How Shall They Be Known? Daubert v. Merrell Dow Pharmaceuticals and Eyewitness Identification,* 16 Pace L.Rev. 237, 242 n. 45 (1996). This court will not assume that this psychological phenomenon is within the common knowledge of jurors. *See generally* D.S. Greer, *Anything But the Truth? The Reliability of Testimony in Criminal Trials,* 11 Brit. J. Criminology 131, 133–35 (1971) (observing the high faith jurors place in eye witness testimony, including when such testimony is unreliable), *as cited in* Steven I. Friedland, *On Common Sense and the Evaluation of Witness Credibility,* 40 Case W. Res. L.Rev. 165, 166 n. 14 (1990).

Also of assistance to the jury was Fulero's expert testimony regarding how "post-event information" can influence an eyewitness. Research regarding post-event information shows that access to facts after an occurrence can, under some circumstances, "change a witness's memory and even cause nonexistent details to become incorporated into a previously acquired memory." Cohen, 16 Pace L.Rev. at 246. *See Ferensic v. Birkett,* 501 F.3d 469, 472–83 (6th Cir.2007) (finding that defendant should have been permitted to provide testimony on post-event information and that, under the narrow circumstances of that case, the error was *not* harmless); *People v. LeGrand,* 8 N.Y.3d 449, 458, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007) (permitting testimony regarding post-event information); *but see United States v. Rodriguez–Berrios,* 445 F.Supp.2d 190, 194 (D.P.R.2006) (Perez–Gimenez, J.) (finding that understanding post-event information "is not the kind of issue that the jurors would be unqualified or unable to determine 'without enlightenment from those

having specialized understanding of the subject involved in the dispute'") (quoting Fed.R.Evid. 702 (Advisory Committee Notes)).

In this case, the two eyewitnesses to the bank robbery conversed with each other prior to providing testimony, and they acknowledged that they may have discussed what the robber looked like. Under such circumstances, testimony about post-event information could be of use to the jury. *See* Fiona Gabbert, et al., *Memory Conformity: Can Eyewitnesses Influence Each Other's Memories For An Event?*, 17 Applied Cogn. Psychol. 533 (2003) (finding that when witnesses discuss events with one another, shared false recollections sometimes result); *see also* Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. Applied Psychol. 360, 361 (1998) ("Eyewitness testimony about an event reflects not only what they actually saw but information they obtained later on."), *as quoted in* Richard A. Wise, et al., *A Triparite Solution to Eyewitness Error*, 97 J.Crim. L. & Criminology 807, 871 (2007); *cf.* Ralph Norman Haber & Lyn Haber, *Experiencing, Remembering and Reporting Events*, 6 Psychol. Pub. Pol'y & L. 1057, 1091–92 (2000) (recommending that eyewitness testimony be excluded if: (1) there is no corroborating testimony, unless the circumstances suggest a greater likelihood of reliability; (2) the witness's account was possibly tainted by suggestive procedures; (3) the witness was exposed to post-event information; or (4) the testimony is the product of a "fleeting glance"). And because "jurors tend to be unduly receptive to, rather than skeptical of, eyewitness testimony," *Smithers*, 212 F.3d at 315, the jury's factfinding ability's will be enhanced by learning about the effects of post-event information.

Another useful aspect of Fulero's testimony was his discussion of the factors that impact the reliability of a photograph identifications. For example, research shows that a photo identification works best when neither the person conducting the photo array, nor the eyewitness, knows who the targeted suspect is. *See* Fradella, 2 Fed. Cts. L.Rev. at 17. Further, eyewitnesses exhibit greater accuracy when they are explicitly informed that "a suspect may or may not be" in a photo array. *Id.* Yet another factor that affects accuracy is whether an eyewitness is shown photographs one after another, rather than being shown multiple photographs at the same time; eyewitnesses who are shown photographs sequentially show greater reliability than those who view photographs simultaneously. *Id.*

The evidence was that, in this case, the eyewitnesses were shown photographs simultaneously; and there was no evidence that these witnesses were told that the suspect "may or may not be" present in the photo array. The research revealing the potential consequences of these facts is likely not within the ken of the average juror. Indeed, exposure to this research proved of great assistance to this court during an earlier phase of this case, as it considered a motion to exclude the photo identifications as unduly suggestive under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); this court ultimately concluded that the photo identifications should not be excluded. If social-science research regarding eyewitness identifications aided this court's ability to understand the evidence as it considered this motion, it would be curious to assume that this same research would be of no aid to the jury.

Finally, Fulero testified to the highly counter-intuitive, but well-founded, theory that the amount of confidence a person has

in a recollection does not correlate well with the accuracy of that recollection. In other words, just because a witness says she is 100% sure of an identification does not mean that the witness's identification is correct. As the Seventh Circuit Court of Appeals has observed, "Sometimes the witness zeroes in on the correct person, sometimes not; there is an element of chance and an opportunity for manipulation. Once the witness decides that 'X is it' the view may be unshakable." *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir.2003). Social-science research "has established that the witness's faith is equally strong whether or not the identification is correct." *Id.* The appellate court in *Newsome* collected an array of publications documenting this phenomenon, *id.*: Daniel L. Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 112–37 (2001); Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* (3d ed. 1997); Elizabeth F. Loftus, *Eyewitness Testimony* (1979; rev. ed. 1996).

In the present case, one witness testified that he was 70% to 80% sure of his identification of the defendant. Another testified on the stand without equivocation that the defendant committed the bank robbery. Jurors often believe that a witness who testifies with such confidence should be accorded stronger weight than a witness who does not. *See Watkins v. Sowders*, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) ("Eyewitness testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all.") (internal citation omitted). In an instance such as this, where intuition is belied by scientific research, testimony from an expert may be of great assistance to a jury. Particularly

in light of the implications of cross-racial identification, all of this information, particularly to the extent it is not common knowledge or intuition, could assist the jury in reaching a fair and accurate determination of the factual issues before it.

It bears reiterating that the expert was not permitted to testify about the credibility and believability of the witnesses in this case. Fulero was not permitted to discuss witnesses in this case at all; nor was Smith allowed to ask Fulero about the credibility or believability of witnesses in this case. Fulero was instead allowed to educate the jury about the psychological literature regarding: cross-racial identifications; how stress impacts identifications; post-event information; and the weak correlation between a witness's confidence and his or her accuracy because these issues are specifically implicated by the factual context of this case. The advisory committee notes to Fed.R.Evid. 702 expressly contemplate that sometimes experts will have this limited role. The notes explain that it is wrong to conclude "that experts testify only in the form of opinions." *Id.* Rather, "an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." *Id.*

The court was convinced at trial that the psychological research supporting the above four subjects is both reliable and helpful and that the constantly increasing knowledge social scientists are obtaining about the inner workings of the human animal are likely not commonly understood or obviously apparent to jurors (or, for that matter, judges). Therefore, educating the jury about this research does not (and, in this case, did not) run afoul of Rule 702, and, indeed, it is an important step along the road to using improved scientific knowledge to create more accu-

rate and fair legal proceedings. It would be anachronistic to categorically bar courts from employing the latest reliable scientific evidence in their effort to make sure that the trials that they administer resemble as closely as possible a search for truth; such a search requires diligently pursuing better understandings of human decisionmaking, including the flaws, weaknesses, and biases that characterize human life. Particularly for cases like this one, in which the reliability of eyewitness testimony is so important and so linked to well-established flaws in human perception and memory, such testimony may be crucial to fair, thorough, informed, and rigorous decisionmaking. It can only help to make factfinders more informed. Applying this research to the facts of this case, however, is within the sole province of the jury.

### B. Rule 403

■ The United States argued that Dr. Fulero's testimony transgressed Fed. R.Evid. 403, which provides that:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

According the government, admitting Fulero's testimony would incite unfair prejudice because his assertions would confuse and mislead jurors about their role as the ultimate arbiters of eyewitnesses' credibility.

The Eleventh Circuit has not had occasion to address whether eyewitness-identification expert testimony would violate Rule 403, and other circuits have split on this question. The Second, Seventh, and Eighth Circuits have reasoned that eyewitness-identification expert testimony might usurp the jury's role of determining witness credibility, thus causing jurors to be confused and misled regarding their role as the trier of fact. *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999) (holding a district court was within its discretion to exclude an expert who "would effectively have inserted his own view of the officers' credibility for that of the jurors, thereby usurping their role"); *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996) (applying a deferential standard to conclude that "the district court properly recognized the very real danger that the proffered expert testimony could either confuse the jury or cause it to substitute the expert's credibility assessment for its own"); *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir.1992) ("the district court's decision to exclude Dr. Loftus' testimony was a proper exercise of its discretion, whether under Rule 702 or Rule 403."); *but cf. United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir.2007) (holding that expert testimony on effect of drug abuse on witness memory would "intrude upon the jury's role in assessing witness credibility" *only because* the defendant had not put forth any evidence to show that the witnesses actually used drugs and that, thus, there was no "factual link" between the expert's testimony and the specific witnesses).

Similarly, in *United States v. Rincon*, 28 F.3d 921, 923–26 (9th Cir.1994), appellate court affirmed a district court's decision to exclude an eyewitness-identification expert under Rules 403 and 702. The court cautioned, though, that the opinion represents an "individualized inquiry" that "does not preclude the admission of such testimony when the proffering party satisfies the standard established in *Daubert* by showing that the expert opinion is based upon 'scientific knowledge' which is both reliable and helpful to the jury in any given case." *Id.* at 926.

In contrast, the Third and Sixth Circuits have ruled that eyewitness-identification expert testimony comports with Rule 403. In *United States v. Mathis,* 264 F.3d 321, 339–40 (3rd Cir.2001), the court reversed a district court's decision to exclude eyewitness testimony based on Rules 403 and 702. Judge Pollack explained that eyewitness-identification experts who employ "reliable scientific expertise to juridically pertinent aspects of the human mind and body should generally, absent explicable reasons to the contrary, be welcomed by federal courts, not turned away." *Id.* at 340. The Sixth Circuit has likewise concluded that a trial court erred in excluding an eyewitness-identification expert under Rule 403, but held that the error was harmless. *United States v. Smith,* 736 F.2d 1103, 1107 (6th Cir.1984); *see also Smithers,* 212 F.3d at 316 (finding that eyewitness-identification expert testimony did not violate Rule 403's prohibition against evidence that invites unjustified "delay").

This court appreciates the especial risk that accompanies expert testimony; despite jury instructions advising jurors not to embrace expert testimony uncritically, *Eleventh Circuit Pattern Jury Instructions (Criminal Cases),* Basic Instruction 7, courts have long expressed concern that jurors may still do exactly that. *United States v. Purham,* 725 F.2d 450, 454 (8th Cir.1984) (observing "the aura of reliability and trustworthiness that surrounds scientific evidence"); *United States v. Addison,* 498 F.2d 741, 744 (D.C.Cir.1974) ("scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen"); *Huntingdon v. Crowley,* 64 Cal.2d 647, 656, 51 Cal.Rptr. 254, 414 P.2d 382 (1966) (noting the need to protect "both litigants and jurors against

the misleading aura of certainty which often envelops a new scientific process"). "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 (citing Hon. Jack Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

This risk was present in Smith's case because unfettered expert testimony could have been construed as direct commentary on other witnesses' credibility. It is axiomatic that "[a]ssessing the credibility of one witness is within the jury's exclusive province." *United States v. Wright,* 392 F.3d 1269, 1274 (11th Cir.2004), *cert. denied,* 544 U.S. 968, 125 S.Ct. 1751, 161 L.Ed.2d 615 (2005); *see also Allison v. United States,* 160 U.S. 203, 207, 16 S.Ct. 252, 40 L.Ed. 395 (1895) ("[I]t was for the jury to test the credibility of the defendant as a witness, giving his testimony such weight, under all the circumstances, as they thought it entitled to, as in the instance of other witnesses ...") *But see* Fed.R.Evid. 704(b) (Advisory Committee Notes) (rejecting as "empty rhetoric" the notion that some expert testimony is inadmissible because it usurps the "province of the jury.") (citing 7 J. Wigmore, Treatise on the Anglo–American System of Evidence in Trials at Common Law § 1920, at 17 (3d ed. 1940)).[5]

But the critical point here is, instead, that this kind of expert testimony can, in some specific circumstances, be helpful, and even essential, to assisting the jury in its exercise of the exclusive power to determine witness credibility. With respect to many other factual determinations

---

**5.** Fed.R.Evid. 704(a) reads that, generally, "testimony in the form of an opinion or inference otherwise admissible is not objectionable

because it embraces an ultimate issue to be decided by the trier of fact."

which are also within the sole province of the jury, expert testimony can help the jury find the relevant facts in a more informed way. Eyewitness-identification expert testimony, as a category, is no different.

The parameters this court placed on Fulero's testimony, moreover, significantly allayed the concern that he would improperly invade the jury's role. Because he was *not* permitted to testify about specific witnesses in this case and instead was allowed only to educate the jury about empirical evidence regarding the previously specified areas of eyewitness-identification research, his testimony did not mislead the jury about its role as the sole factfinder in a criminal jury trial. Accordingly, he was not allowed to "effectively [ ] insert[ ] his own view of the [witnesses'] credibility for that of the jurors, thereby usurping their role." *Lumpkin*, 192 F.3d at 289.

Indeed, it is difficult to see how it could possibly be prejudicial to provide scientifically robust evidence that seeks to correct misguided intuitions and thereby prevent jurors from making common errors in judgment simply by giving them more accurate information about issues directly relevant to the case. The court's restricted approach, which presented little risk of unfair, targeted, and prejudicial attacks on specific witnesses, maximizes the important values that underlie our legal system's reliance on criminal trials, including the role the jury plays as a factfinder to be trusted and a defendant's right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend VI.

## III. TIMELINESS

■ Smith contended that the court should not reach the merits of the government's motion to exclude Dr. Fulero's testimony, because that motion was untimely under this court's order on December 7, 2007. The order addressed the government's earlier motion to exclude expert testimony and its alternative motion for a *Daubert* hearing. The motion to exclude expert testimony was temporarily denied. The court "further ORDERED that the alternative motion for *Daubert* hearing is denied with leave to either party to renew the request by no later than February 1, 2008." *Id.*

Failure to comply with a court's deadlines is a serious matter, and when it happens a court has a wide range of sanctions it may issue, including refusing to consider a belated motion. *See Macsenti v. Becker*, 237 F.3d 1223, 1234 (10th Cir.2001) ("we find no plain error in the rejection by the trial judge of the belated *Daubert* objection."); *see generally* Fed.R.Civ.P. 16(f) ("If a party or party's attorney fails to obey a scheduling or pretrial order . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).")

The government countered that it is immaterial that there is the clause in this court's order stating that the alternative motion for a *Daubert* hearing was due on February 1 because the government did not request a *Daubert* hearing. It was instead seeking to exclude the expert testimony without such a hearing.

It was unnecessary to resolve whether the court should have precluded Fulero's testimony because even if the government's motion was tardy, refusing to address the motion would not have been he proper remedy in this instance. The Eleventh Circuit has articulated three factors to consider when determining whether to strike a document: the importance of the document or testimony; the reasons the

deadline was traversed; and the prejudice faced by opposing party. *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir.2004) (applying these factors to determine whether to exclude a witness not listed in a pretrial order). The important nature of the issue presented in the government's motion has been already been acknowledged. More importantly, Smith was not prejudiced by this court's decision to consider the government's motion because the court denied the motion.

Another reason Smith was not prejudiced is because, even if the government had not filed a motion to preclude Fulero's testimony, this court would have undertaken a *Daubert* inquiry sua sponte. In *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 563 (11th Cir.1998), the Eleventh Circuit affirmed, in part, a district court's sua sponte exclusion of expert testimony.[6] Here, considering the importance of the eyewitness testimony in this case and the potential danger of unrestricted or unreliable expert testimony about these witnesses, this issue called out for a *Daubert* inquiry.

\* \* \*

In conclusion, it should not be overlooked that, in issuing this opinion today, the court has the benefit of hindsight. The court has now been able to see just how the admission of the eyewitness-identification expert testimony actually played out at Smith's trial.

First, the admission of the testimony did not pose any unusual or especially difficult problems for the parties or the court. Each side was able to examine the expert adequately and, using the expert's testimony, present to the jury in an orderly way a picture of the evidence that was more fully developed and reliable than it would otherwise have been. Second, the jury, in assessing the evidence and reaching its verdict, had important and practical information that it would otherwise not have been to use in the assessing the evidence and engaging in fair, thorough, informed, and rigorous decisionmaking. Finally, as a result, not only did Smith receive a fairer trial, but the jury, the court, and the entire judicial system can rest much more comfortably that Smith's robbery conviction is a reliable outcome because the conviction is much less likely to have been infected by the flaws uncovered by recent empirical studies on eyewitness-identifications. While the court cannot, and does not, say that the admission of eyewitness-identification expert testimony is essential to a fair trial, its admission can, most certainly, be quite helpful in some cases.

---

6. Other courts addressing the issue have also determined that district courts may undertake a *Daubert* hearing on their own motion. *Miller v. Baker Implement Co.*, 439 F.3d 407, 413 (8th Cir.2006) ("we conclude that it did not abuse its discretion by undertaking a sua sponte *Daubert* analysis in dealing."); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's sua sponte consider-

ation of the admissibility of expert testimo-
ny.'').